Kenneth J. ROSA, et al., Plaintiffs,

v.

RESOLUTION TRUST CORPORATION,
et al., Defendants.

Civ. No. 90–4559 (CSF).

United States District Court,
D. New Jersey.

Dec. 5, 1990.

**1232**

Roger B. Kaplan, Laura Studwell, Richard Robins, Wilentz, Goldman & Spitzer, Woodbridge, N.J., for plaintiffs.

Arthur Meisel, Ann. F. Kiernan, on the brief, Jamieson, Moore, Peskin & Spicer, Princeton, N.J., Dennis S. Klein, Robert P. Fletcher, Hopkins & Sutter, Washington, D.C., for defendant Resolution Trust Corp.

Sara L. Reid, Kelley, Drye & Warren, Parsippany, N.J., for Manufacturer's Hanover.

## OPINION

CLARKSON S. FISHER, District Judge.

Before the court is a motion for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure. A class of employees seeks to enjoin defendants Resolution Trust Corporation ("RTC"), City Federal Savings Bank, City Savings Bank, F.S.B., and City Savings F.S.B. from resolving an employee pension plan in violation of the terms of the Plan and Agreement of Trust, and the applicable sections of the Employee Retirement Income Security Act of 1974 ("ERISA"). In addition, the plaintiffs wish to force defendants to continue funding the Plan as required by the Plan documents. For the following reasons, this preliminary injunction is granted.

### FINDINGS OF FACT

The facts below are undisputed. On December 31, 1985, City Federal Savings Bank (then known as "City Federal Savings and Loan Association") adopted the Minimum Benefit Retirement Plan ("Plan"). The express purpose of the Plan was to provide:

> retirement benefits and certain other benefits to eligible employees of the Bank and its participating subsidiaries and other participating companies, or to the beneficiaries of such employees, and thereby to encourage employees to make and continue careers with the Bank, all as set forth herein and in the Trust Agreement adopted as part of this Plan.[1]

---

1. City Federal had entered into an Agreement of Trust (the "Trust") with defendant Manufacturers Hanover Trust Company whereby Manufac-

Ver. Compl. Exh. A at 2.[2]

Section 12 of the Plan sets forth the "Minimum Funding and Contribution" requirements, as follows:

> [T]he Company shall contribute to the Trust, not less frequently than once a year, in accordance with the Code and Regulations, the amounts recommended by the Actuary to the Committee as necessary to maintain the Plan on a sound actuarial basis, consistent with [ERISA], the Code and Regulations after taking into account the retirement benefits to be provided to Participants under the ESOP and retirement benefits previously provided under the Prior Plan. The Committee shall arrange for the establishment and maintenance by the Actuary, or in accordance with his recommendations, of such funding accounts as required by [ERISA].

*Id.* at 62, § 12.1.

On December 7, 1989, the Director of the Office of Thrift Supervision ("OTS"), Department of the Treasury, ordered that City Federal be closed, and the RTC be appointed Receiver and take possession of City Federal. On that same day, OTS created City Savings Bank, F.S.B. ("City Savings Bank") which assumed certain assets and liabilities of City Federal pursuant to a Purchase and Assumption Agreement dated December 8, 1989. In addition, the employees of City Federal became the employees of City Savings Bank.

On December 9, 1989, Jack P. Shinn, RTC's Managing Agent, met with Jeffrey J. Kaplowitz, City Federal's Executive Vice President in charge of Human Resources, to discuss the various plans in effect and the plans RTC would assume. On December 11, 1989, Shinn distributed a Memorandum which stated: "Employees are the essence of our business. We need you to continue our operations. City Savings [Bank] is maintaining all of City Federal's benefits programs, except for the Employ-

ee Stock Ownership Plan." Ver. Compl. Exh. C.

Shortly thereafter, at the behest of Shinn, Kaplowitz distributed a December 21, 1989 Benefits Memorandum to all employees which specifically stated that the Plan at issue would "continue[ ] unchanged with service from City Federal bridged to City Savings. The eligibility requirements remain the same." Ver. Compl. Exh. D at 2; Kaplowitz Dep. at 21–24.

In a December 26, 1989 memorandum, Thomas W. Meagher (City Savings Bank's in-house attorney responsible for ERISA matters) advised Kaplowitz that in order to effect the assumption of the Plan, City Savings Bank, F.S.B.'s Board of Directors or the RTC (until a board could be elected), had to expressly amend the plan to provide for its assumption and continuation by City Savings Bank, F.S.B. The memorandum further stated that proposed amendments to the Plan for the assumption would be drafted and forwarded to Kaplowitz's attention for appropriate adoption. Exh. D–1.

After reviewing this Memorandum in detail, on January 8, 1990, Shinn forwarded a "Notice of Reportable Event" (Exh. P–9) to the Pension Benefit Guaranty Corporation ("PBGC") which expressly provided that the Plan had been assumed by City Savings Bank, effective December 8, 1989. In addition, Shinn appointed Kaplowitz as Plan Administrator and told him to take the necessary steps of notification to comply with ERISA. Kaplowitz Dep. at 31–32.

Various memoranda and talks were had as to the funding and contribution requirements for the Plan. The demise of the ESOP plan had provided a need for additional funding obligations for the Plan beyond the $1 million contribution previously scheduled for 1989. Shinn was fully apprised of this fact and of the revised quarterly contributions the actuaries had provided by memorandum of January 26, 1990. Kaplowitz Dep. at 29.

turers Hanover was designated "Master Trustee" for the Plan.

**2.** Ver. Compl. refers to the plaintiffs Verified Complaint. In addition, deposition exhibits are cited as "D–#" (defendants) and "P–#" (plaintiffs).

A meeting was held on January 30, 1990, specifically to discuss the new, revised "Expense" and "Funding" Requirements of the Plan. The meeting was attended by Shinn (RTC's Managing Agent), Maron (RTC's Assistant Managing Agent), Robertson (RTC's Pension Expert assigned to City Savings Bank by RTC–Atlanta), Kaplowitz (City Savings Bank's Executive Vice President in charge of Human Resources), O'Connor (City Savings Bank's Vice President in charge of Employee Compensation and Benefits, reporting to Kaplowitz), Elinor Hauer (City Savings Banks's Assistant Vice President, reporting to O'Connor), and David Zulauf (City Savings Bank's Assistant Comptroller). The meeting analyzed and discussed the revised "Expense" number of approximately $2,718,957.00 and the revised "Funding" schedule for the Pension Plan totalling $3,212,678.00 as set forth in the Memorandum of January 22, 1990 (Exh. D–2) and in the actuaries' letter report of January 26, 1990 (Exh. P–2).

The next day, Shinn sent Robertson's memorandum and Kaplowitz's reply about the Plan to Sandra A. Waldrop, RTC–Atlanta. Shinn was then transferred back to Atlanta and was succeeded by Brian H. McClelland as RTC's Managing Agent. McClelland was advised as to the results of the Pension Plan meeting of January 30. Although McClelland denies remembering, Kaplowitz testified in detail that he had met with and apprised McClelland of everything, and although McClelland did not agree with Shinn's actions in every regard, he nonetheless went forward with the assumption of the Plan as evidenced by his request to prepare the necessary IRS documents (Kaplowitz Dep. at 54–58), the execution of a Trust Amendment on February 9, 1990 (Ver. Compl. Exh. F), and the Plan Amendments on February 12, 1990 and March 1, 1990 (Ver. Compl. Exhs. G and H) pursuant to which the Pension Trust and Plan were formally adopted and assumed by RTC for City Savings Bank.

In a March 1990 "Notice To Interested Parties," distributed to all employees of City Savings Bank, the employees were again informed that the Plan was taken over by City Savings Bank, and that City Savings Bank was the Sponsor and Administrator. Ver. Compl. Exh. I.

On March 19, 1990, City Savings Bank sent the revised funding contribution schedule to the PBGC (Exh. P–11) (setting forth the $3.213 million funding schedule). Pursuant to that schedule, in January 1990, City Savings Bank made the Fourth Quarterly Contribution for the 1989 Plan Year; and in April 1990 made the First Quarterly contribution of $271,672 for the 1990 Plan year. However, at the direction of the RTC (Ver. Compl. Exh. J), City Savings Bank has failed to make the Second and Third Quarterly contributions for 1990 (totalling $552,344) and the final payment for 1989 (Kaplowitz Dep. at 111–12). On July 17, 1990, City Savings Bank acknowledged that the failure to submit the Second Quarterly Plan contribution (due on July 15, 1990) was not in compliance with ERISA. Ver. Compl. Exh. K.

On July 19, 1990, the RTC published a "Notice to all Participants and Beneficiaries of the City Federal Savings Bank Minimum Benefit Retirement Plan." Ver. Compl. Exh. L. Through this Notice, the RTC informed the participants and beneficiaries that it was seeking to terminate the Plan. The RTC further stated that it was "aware that [the employees] were previously informed that the Plan would be assumed by City Savings and that [they] would continue to accrue benefits under the Plan for [their] service with City Savings." *Id.*

Further, the Notice manifested RTC's intent to terminate the Plan retroactively, effective December 7, 1989, despite the express Plan amendments which prohibited such retroactive action. On that same date, July 19, 1990, the RTC issued a "Notice of Intent to Terminate the City Federal Savings Bank Minimum Benefit Retirement Plan." Ver. Compl. Exh. M.

Thereafter, on or about September 11, 1990, the RTC prepared a purported "Second Amendment" to the Plan which contradicted the earlier Plan and Trust Amendments, the earlier memoranda and oral representations, and which contained the fol-

lowing provision: "[City Federal] has determined that the Plan continues to remain a Plan of [City Federal] and is not to be treated as assumed by City Savings Bank, F.S.B." Ver. Compl. Exh. O. This Second Amendment designated the Plan as the "City Federal Savings Bank Minimum Benefit Retirement Plan," and referred to City *Federal's* alleged determination with regard to the Plan—even though City Federal no longer existed, and even though the RTC and City Savings had changed the Plan's name to the "City Savings Bank, F.S.B." Plan.

On September 17, 1990, the Managing Agent of City Savings Bank, an RTC employee, prepared and signed a Form 5500 ("Annual Return/Report of Employee Benefit Plan") which stated that there was a change in the Plan status since benefits ceased to accrue after 12/7/89 due to the 9/20/90 termination of the Plan. Ver. Compl. Exh. P. In that same form the RTC set forth the name of the Plan as the "City Federal Savings Bank Minimum Benefit Retirement Plan," despite the fact that City Savings Bank, under the direction of the RTC, had assumed the Plan, and changed the name of the Plan to the "City Savings Bank, F.S.B. Minimum Benefit Retirement Plan." Ver. Compl. Exh. G. In addition, RTC sent a "Notice of Reportable Event" on September 19, 1990 (dated August 24, 1990) to counsel of the PBGC, which failed to mention that City Savings Bank had assumed the Plan and changed the Plan's name. Ver. Compl. Exh. Q. Finally, on September 21, 1990, the RTC closed City Savings Bank, F.S.B., placed it in Receivership, and transferred certain assets and liabilities to the new entity, City Savings, F.S.B. Plaintiffs assert that these actions were designed, in part, to avoid the legal obligations to City Savings Bank by circumventing the Requirements of FIRREA through an unauthorized and "sham" second receivership, and conservatorship entity.

As a result of the above actions plaintiffs ask this court to enjoin and restrain the RTC, City Federal, City Savings, and their officers and agents from taking any further action to terminate the Plan. They further request an order requiring the defendants to pay and deliver to the Plan (to the Master Trustee): (1) the Second and Third Quarterly Contribution for the 1990 Plan Year in the amount of $542,344 and, (2) the balance of the Minimum Funding Contribution for the 1989 Plan Year in an amount to be determined by this court at a proof hearing after actuarial depositions (it is estimated at over $2 million). In addition, this injunction would force defendants to make all future contributions to the Plan as required by the Minimum Funding Requirements of the Plan.

## I.

This court will first address the various procedural defenses raised by the defendants.

### A. *12 U.S.C. § 1821(j).*

The first such defense is that this court is barred from enjoining the RTC pursuant to 12 U.S.C. § 1821(j),[3] which provides:

> Except as provided in this section, no court may take any action, except at the request of the Board of Directors by regulation of order, to restrain or affect the exercise of powers or functions of the Corporation as a conservator or receiver.

However, plaintiffs claim that § 1821(j) is inapplicable to this case because although RTC has the power to revoke a contract, nothing in FIRREA gives it this power as to a contract it has already assumed. Accordingly, once the RTC had assumed the contract in question, its actions were outside the Section 1821's "functions or powers of the corporation as conservator or receiver."

In addition, even if this court were to find the RTC's actions within its conservatory powers, plaintiffs claim that FIRREA does not prevent them from commencing

**3.** Plaintiffs raised this defense in their motion for dissolution of the preliminary injunction. For simplicity this court will treat both the motion for dissolution and the preliminary injunction application together.

an action to compel defendants to do that which they are statutorily obligated to do under ERISA and pursuant to the terms of the Plan. In support of this contention, plaintiffs point to *The Rechler Partnership v. The Resolution Trust Corporation,* No. 90 Civ. 3091 (D.N.J. Sept. 4, 1990), which involved a declaratory judgment action by plaintiffs to determine whether the RTC had exceeded a "reasonable time" under FIRREA in assuming a lease. The court held that plaintiffs had not asked the court to restrain the RTC but rather sought the interpretation of a federal statute, and proceeded to extend the time RTC had to repudiate or assume the lease for six days. The court found that although its interpretation would bind the RTC and thus "in a colloquial sense restrain it," this was not an extraordinary result but a necessary one to further the separation of powers. *Id.* at 4.9–4.10. The court concluded:

> FIRREA did not, and Constitutionally could not, divest an aggrieved plaintiff of the right to seek legal redress when the very subject of the grievance is agency action that is allegedly arbitrary and statutorily impermissible.

*Id.* at 4.9.

Defendants, at oral argument, claimed that 29 U.S.C. § 1144(d) prevented ERISA from being used in this way to supersede another United States law. That section provides:

> Nothing in this subchapter should be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States ... or any rules or regulations issued under any such law.

Defendants specifically relied upon *Calhoun v. FDIC,* 653 F.Supp. 1288 (N.D.Tex. 1987), for the proposition that the Federal Banking Agency laws supersede ERISA. In that case, however, the court did not hold that the FDIC is immune from ERISA regulations once it acts as an ERISA fiduciary. Rather, it held that plaintiff could not establish ERISA jurisdiction because: (1) the Plan was terminated before the FDIC became a receiver; and (2) the FDIC did not act as a fiduciary in the first place.

This case differs from *Calhoun* in two ways. First, unlike the *Calhoun* plan, the Plan here was terminated *after* RTC became receiver. Second, this court finds that the RTC acted as a fiduciary, unlike the FDIC in *Calhoun.* ERISA defines a person as a fiduciary to the extent that he exercises any discretionary authority or control respecting management of such plan, or exercises any authority or control respecting management or disposition of its assets. 29 U.S.C. § 1002(21)(A)(i). In *Calhoun,* the FDIC did not act as a fiduciary as it merely held onto the deposits already there. RTC, on the other hand, became a fiduciary when it directed that the bank assume the plan and further directed that it be retroactively terminated. As a fiduciary, it was thus subject to the ERISA regulations.

Further, the *Calhoun* court correctly stated in its analysis that when there is an apparent conflict in the operation of two statutes affecting the same subject matter, the statutes are to be given effect consistent with each other whenever possible. *Accord Columbia Gas Dev. Corp. v. Federal Energy Regulatory Comm'n,* 651 F.2d 1146, 1158 (5th Cir.1981). Although Calhoun correctly considered ERISA's specific provision that it would not supersede other federal laws, that case involved a specific statute authorizing specific powers seemingly in contravention of ERISA. Here, however, nothing in FIRREA expressly allows the RTC to retroactively reject a fully assumed pension plan. Once the RTC has assumed a Plan, it must be subject to the laws that control that contractual obligation, namely ERISA. To find otherwise would make the RTC completely immune from any judicial review and arbiter of its own actions.

■ In sum, the RTC should not be permitted to be "the judge of the propriety of its own conduct" and Congress "did not create a fourth branch of government beyond the scrutiny of the law" when it vested certain discretionary powers in the RTC to "wind up the affairs of the various institutions under its aegis." *Rechler,* at 4.8. Accordingly, defendants' attempt to frame

the issue in this case as one of "restraint" of the powers of the RTC must fail. Such powers are not at issue when plaintiffs seek an adjudication that defendants have failed to comply with their statutory obligations under ERISA, and an injunction compelling them to comply with same.

### B. *The Administrative Claims Procedure*

 Defendants next argue that this court lacks jurisdiction over this action because plaintiffs are obligated to exhaust their administrative remedies under FIRREA before the commencement of a legal action. *See* 12 U.S.C. §§ 1821(d)(3)–(13) (1990). However, as this court recently held in *Rechler* in a similar context, that argument is without merit:

> [T]he language of the administrative claims procedure explicitly indicates that it was designed to address pre-Receiver claims against the failed depository institution and not post-Receiver [claims] against RTC.

Opinion, at 4.5.

*Rechler* recognized that the claims procedure was designed to allow the RTC to approve or disapprove asserted claims against the "failed institution" which arose *prior* to RTC's intervention and takeover of the failed institution; therefore, it was inapplicable to the RTC's failure to assume a lease after the RTC had taken over the failed institution. Similarly, this case involves RTC's actions after it took over the bank; therefore, the claims procedure is also inapplicable here. Application of the claims procedure in this case would allow the RTC to adjudicate claims against *itself* for *its own conduct* occurring after the takeover of City Federal.

In addition, ERISA, 29 U.S.C. § 1370 (Supp.1990), sets forth specific remedies and "Enforcement Authority Relating To Terminations of Single–Employer Plans." Section 1370(a) states that a party to a plan terminated illegally who is adversely affected may bring an action: "(1) to enjoin such act or practice, or (2) to obtain other appropriate equitable relief (A) to redress such violation or (B) to enforce such provi-

sion." Further, § 1370(c) provides that "[t]he district courts of the United States shall have exclusive jurisdiction of civil actions under this section." These sections evidence strong Congressional policy to enjoin, restrain and remedy any acts to terminate a Plan which violate ERISA. Moreover, FIRREA provides no avenue under its administrative procedure for "injunctive" or "other appropriate equitable relief." As such, construing the two statutes together, we must conclude that this action is properly before the court. Consequently, defendants' argument regarding failure to exhaust administrative remedies under FIRREA is rejected.

## II.

Now that it has been determined that this court has jurisdiction over this action, I will turn to the substantive issues surrounding the preliminary injunction application.

 The Third Circuit has established the following criteria to determine whether a temporary restraining order or preliminary injunction should issue:

1) whether the moving party is reasonably likely to prevail on the merits (reasonable probability of success);

2) whether the movant will be irreparably harmed if injunctive relief is not granted;

3) whether issuance of an injunction will not result in greater harm to the non-moving party; and

4) whether the public interest would be served by the granting or denial of a preliminary injunction.

*Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197–98 (3d Cir.1990); *Colt Industries, Inc. v. Fidelco Pump & Compressor Corp.*, 844 F.2d 117, 118–19 (3d Cir.1988). In this action, plaintiffs have satisfied all the requirements for the issuance of a preliminary injunction; therefore their application is granted.

### A. *Likelihood of Success on the Merits*

 This action centers around defendants' alleged violations of ERISA and the contractual terms of the Plan. ERISA pro-

vides for civil enforcement, including an injunction, of an employer's obligations to make contributions to pension plans. 29 U.S.C. §§ 1132(a)(3), 1145. The RTC and City Savings Bank were required to make contributions to the Plan pursuant to the terms and conditions of the Plan and the 1990 Amendments to the Plan and the Trust. By directing the Plan Administrator to refrain from making the required contributions, RTC and City Savings Bank have clearly violated their fiduciary duties under ERISA. *See Gould v. Lambert Excavating, Inc.*, 870 F.2d 1214, 1217 (7th Cir.1989) (refusal to pay delinquent contributions was a breach of fiduciary duty under ERISA); *Laborers Fringe Ben. Funds—Detroit & Vicinity v. Northwest Concrete & Constr., Inc.*, 640 F.2d 1350, 1353 (6th Cir.1981).

■ In addition, the denial of vested benefits constitutes a breach by the RTC and City Savings Bank of fiduciary duties under ERISA. *See Brug v. Pension Plan of Carpenters Pension Trust Fund*, 669 F.2d 570 (9th Cir.), *cert. denied*, 459 U.S. 861, 103 S.Ct. 135, 74 L.Ed.2d 116 (1982) (plan administrators violated fiduciary duties under § 404 by retroactively applying plan provision excluding beneficiary from coverage where beneficiary had been eligible at time she applied for benefits); *Swackard v. Commission House Drivers Union Local No. 400*, 647 F.2d 712, 713 (6th Cir.), *cert. denied*, 454 U.S. 1033, 102 S.Ct. 572, 70 L.Ed.2d 477 (1981) (retroactive denial of vested right violated ERISA).

Further, PBGC, the governmental entity in charge of regulating pension plans and plan terminations, in Opinion Letter No. 82–25 (1982), confined retroactive terminations of insufficient employer pension plans to situations where: (a) the participants have "no expectation of continued employment after the proposed date [of termination];" (b) the participants "[are] notified on that date of the contemplated termination;" and (c) "no significant loss to the participants results."

■ Defendants offer no defense that they complied with ERISA or the PBGC. Instead, they advance the argument that 12 C.F.R. § 563.47 (1989) specifically authorizes the RTC as Receiver for City Federal to terminate the Plan, despite its earlier decision to assume it. Section 563.47 provides that no savings association may sponsor an employee pension plan which, "because of unreasonable costs or any other reason, could lead to material financial loss or damage to the sponsor." On July 5 and 12, 1990, the Managing Agent Committee of City Savings met to determine whether the Plan could cause material loss or damage to City Savings. McClelland Aff., ¶ 2. The Committee concluded that because the Plan was significantly underfunded the perpetuation of the Plan would cause material loss or damage to City Savings Bank, and therefore they would terminate it. Consequently, defendants argue that they had just cause to terminate the Plan.

While this argument has appeal, this court does not agree that this CFR section gives the RTC the unfettered discretion to retroactively terminate a pension plan. As plaintiffs assert, while the regulation allows the RTC in the first instance to decline sponsoring a plan it has determined could cause material loss, the regulation does not allow the RTC to elect to sponsor a plan, with knowledge of the costs and potential gains or losses, to then assure the participants and beneficiaries that the plan will continue, and *then* retroactively withdraw its sponsorship upon a purported "reassessment" of the financial data. If accepted, any bank could simply announce that it was concerned about potential financial losses arising from a plan it sponsored, and thereafter abandon the plan without regard to ERISA. This would render meaningless the ERISA requirements imposed on all banks, a result Congress could not have intended given ERISA's goal of protecting pension plans and their participants and beneficiaries.

Similarly, defendants' argument that the government cannot be "estopped" or bound by "unauthorized" conduct must fail. All of the evidence demonstrates overwhelmingly that the RTC was fully apprised during the entire assumption process. Consequently, any contention that an agent, act-

ing for RTC, was not authorized to assume the Plan lacks merit.

For the above reasons, this court finds that the plaintiffs have met the burden of showing a likelihood of success on the merits.

### B. *The Irreparable Harm Requirement*

This is probably the most important requirement in determining whether to grant a preliminary injunction. It is not enough to establish a risk of irreparable harm; a plaintiff must prove a clear showing of immediate irreparable injury. *Ecri v. McGraw Hill, Inc.*, 809 F.2d 223, 225 (3d Cir.1987).

■ In general, courts have found that an injury must be peculiar, such that money damages do not atone for it. *Id.* at 226. However, the fact that the payment of money damages is involved does not preclude a finding of irreparable injury. *United Steelworkers v. Fort Pitt Steel Casting Div. of Conval–Penn, Inc.*, 598 F.2d 1273, 1280 (3d Cir.1979). In fact, the Third Circuit allows a preliminary injunction where warranted to preserve the very availability of a damage remedy. *See Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 205 (3d Cir.1990), (the possibility of an unsatisfied money judgment, as a matter of law, can constitute irreparable injury for preliminary injunction purposes). *Accord Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290, 61 S.Ct. 229, 234, 85 L.Ed. 189 (1940) ("[t]here were allegations that [the defendant] was insolvent and its assets in danger of dissipation or deletion. This being so, the legal remedy against [the defendant], without recourse to the fund in the hands of [a third party], would be inadequate."); *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43 (1st Cir.1986) (upholding a preliminary injunction issued to protect a potential damages remedy); *Foltz v. U.S. News & World Report*, 760 F.2d 1300, 1307–09 (D.C.Cir.1985) (holding that the irrevocable loss of a cause of action for monetary recovery against an ERISA-covered pension plan would constitute irreparable injury for preliminary injunction purposes).

■ In this case defendants contend that plaintiffs cannot prove irreparable harm because an adequate money damage is available to them through normal litigation channels. This court cannot agree. First, as the cases above demonstrate, a preliminary injunction is available to preserve the availability of a money damage remedy. Here, RTC's avoidance of its obligations to the Plan participants and beneficiaries and attempts to immunize itself from judicial review by creating City Savings, F.S.B. threatens the plaintiffs' ultimate ability to collect a damage remedy.

Moreover, the ongoing refusal by RTC and City Savings to make the required contributions to the Plan further warrants injunctive relief because such conduct threatens the Plan's actuarial soundness. *See Gould*, 870 F.2d at 1217 ("ERISA provides for civil enforcement, including an injunction, of an employer's obligations to make contributions to pension plans [and] "failure to make contributions jeopardizes the actuarial soundness of the plaintiff's Funds."); *Robbins v. Lynch*, 836 F.2d 330, 333 (7th Cir.1988). Defendants argue that failure to make contributions to employee trust funds does not constitute *per se* irreparable harm and the court must evaluate the particular facts of each case. In this case, however, there are many factors which point to a finding of irreparable harm.

■ For example, some employees have been paid lump sums from the plan since December 7, 1989, at a level significantly higher than had the plan in fact ended on December 7, 1989. If the plan is retroactively terminated, there will have been undue depletion of the plan by virtue of the past recipients getting more than current recipients. Second, Kenneth Rosa, the named plaintiff, has been retired since December 7, but has been unable to get any benefit payments from the pension for which he is entitled. Lastly, the new entity RTC has created is planned to be resolved and there is no guaranty that money will be available in the Plan to pay subsequent retirees. All of these factors support this

court's finding that plaintiffs have demonstrated that they will be irreparably harmed without preliminary relief.

### C. *Harm to Defendants*

 The RTC argues that its Congressional thrift regulation function outweighs the "limited, if any, benefit" plaintiffs will receive if a preliminary injunction should issue. First, plaintiffs will receive more than just a "limited" benefit. They represent innocent participants and beneficiaries who will likely not receive their pensions in full absent a preliminary injunction. Further, the RTC's role in regulating the thrift industry does not give it unbounded license to violate its contractual and federal statutory obligations to the participants and beneficiaries of a pension plan which it knowingly agreed to assume and promised to continue. Accordingly, this court finds that this preliminary injunction will cause no harm to the defendants.

### D. *The Public Policy*

This court's final consideration in weighing the appropriateness of a preliminary injunction is the public interest. ERISA contains express language that evinces a clear national public interest in protecting employees:

> Congress finds ... that the continued well-being and security of millions of employees and their dependents are directly affected by these plans; that they are affected with a national public interest.

29 U.S.C. § 1001(a). In fact, the many cases granting preliminary injunctive relief to ERISA plan participants and beneficiaries emphasize the importance of this national public interest. *See Gould,* 870 F.2d at 1221; *Anthony v. Texaco, Inc.,* 803 F.2d 593, 597 (10th Cir.1986); *Van Drivers,* 551 F.Supp. at 432 (citations omitted) ("It is clear that stability and protection require assurance of adequate funding and the prevention of arbitrary termination rights."); *Security Federal Savings Bank v. OTS,* 747 F.Supp. 656 (N.D.Fla.1990). In *Security Federal,* the court issued a preliminary injunction to prevent the OTS from unilaterally abrogating a contract between

FSLBB and plaintiffs. The court stated that "the public interest is best served by requiring the government to honor its obligations." 747 F.Supp. at 660.

 Bearing in mind the necessity of enforcement of ERISA's strict fiduciary duties, *see Chait v. Bernstein,* 835 F.2d 1017, 1027 (3d Cir.1987), and the absence of any compelling interest in giving the RTC unfettered discretion to abrogate pension plans on a whim, this court finds the national public policy of ERISA weighs heavily in favor of granting this preliminary injunction.

In conclusion, for the foregoing reasons, this court grants plaintiff's request for a preliminary injunction. An order accompanies this opinion.