**SECURITY FEDERAL SAVINGS BANK OF FLORIDA, et al., Plaintiffs,**

v.

**DIRECTOR, OFFICE OF THRIFT SUPERVISION, Defendant.**

No. 90–50140–RV.

United States District Court, N.D. Florida, Panama City Division.

Aug. 10, 1990.

Fred M. Johnson, Fuller, Johnson & Farrell, Tallahassee, Fla., William L. Gardner, Morgan, Lewis & Bockius, Washington, D.C., for plaintiffs.

Asst. U.S. Atty., J.D. Roy Atchison, Pensacola, Fla., Aaron B. Kahn, Sr. Trial Atty. Office of Thrift Supervision, Washington, D.C., for defendant.

## MEMORANDUM OPINION

VINSON, District Judge.

On July 25, 1990, after notice to the parties, a hearing was held on the plaintiffs' motion for a preliminary injunction. At the close of that hearing, I granted the plaintiffs' motion. This memorandum opinion supplements the findings made on the record at the hearing.

Security Federal Savings Bank of Florida (Security Federal) was originally chartered in Panama City, Florida, in 1952 as a mutual savings association. Like most Florida savings and loans, it grew steadily until the interest rates reached double digits in the late 1970s and early 1980s. When that happened, its cost of money for deposits exceeded the return from long term, fixed-rate home mortgage loans. The interest rate gap resulted in significant losses. In order to help all savings and loans deal with this problem, the Federal Home Loan Bank Board promulgated new regulations in 1981, which allowed the losses from the sale of low-yield home mortgage loans to be amortized over the period of the loans, with the unamortized portion of the loss to be included as capital for regulatory purposes. In 1982, Security Federal sold most of its fixed-rate loan portfolio, which generated a paper loss of about $4.25 million. The unamortized portion of this loss was included in its regulatory capital, an amount now equal to about $2.9 million.

In the three years between 1983 and 1985, Security Federal was quite profitable. However, in 1986 it incurred several large loan losses that left it with a slightly negative net worth and facing receivership. In an effort to avoid receivership, Laurance A. Hardee, the president of Security Federal, negotiated on behalf of himself and thirteen other officers and directors of Security Federal with the Federal Home Loan

Bank Board (FHLBB) to convert Security Federal from a mutual savings and loan association to a stock savings and loan association. Both Security Federal and the FHLBB sought to avoid placing Security Federal in receivership. FHLBB wanted the officers and directors of Security Federal to invest their own funds into Security Federal to improve the banks' capital position and to give the directors a personal stake in the success or failure of the institution. The directors of Security Federal were interested in investing, but not without certain assurances from the government. Specifically, the directors wanted the FHLBB to agree that Security Federal could continue to include deferred loan losses as a component of its regulatory capital. FHLBB initially declined to approve the conversion unless Security Federal eliminated deferred loan losses from its capital structure. The prospective investors, however, maintained that they would not invest in Security Federal under those circumstances: unless the deferred loan losses were included as a component of Security Federal's regulatory capital, the additional $3.5 million in capital from the investors would barely raise the regulatory capital above zero. Under such thin regulatory capitalization, Security Federal was not a sound investment. The parties continued to negotiate.

Following the negotiations, on December 23, 1987, the FHLBB approved Security Federal's application for a voluntary supervisory conversion from a federally chartered mutual savings and loan association to a federally chartered stock savings and loan association. The conversion required that the directors invest $3.6 million in Security Federal. In exchange for this commitment on the part of the directors, the FHLBB agreed in the "conversion agreement" that Security Federal could continue to include its deferred loan losses in its regulatory capital, provided that the losses were amortized over the remaining life of the loans, a period then estimated to be approximately 215 months. It is this agreement by the FHLBB that is the basis of this litigation.

In the summer of 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), which abolished the FHLBB and established the Office of Thrift Supervision (OTS). The OTS was given broad statutory authority to regulate the thrift industry and to eliminate the practices that had contributed to the savings and loan crisis. On November 7, 1989, OTS issued regulations governing minimal capital standards. These regulations disallowed deferred loan losses as a component of regulatory capital.

On November 15, 1989, OTS notified Security Federal that it was not in compliance with the new minimum capital standards. As a result of this deficiency, OTS required Security Federal to submit a capital restoration plan by January 8, 1990. Security Federal submitted its plan as required, but the plan was rejected, primarily because Security Federal continued to include its deferred loan losses as a component of its regulatory capital. Since that time, OTS has imposed various restrictions on the operations of Security Federal, including severe restrictions on lending, and a "no-growth" condition.

On June 1, 1990, OTS notified Security Federal that OTS would be proposing a Consent Agreement to provide OTS with the authority to "negotiate a plan of merger, consolidation, transfer of assets and liabilities, or acquisition of, or capital infusion for the institution." In response, the plaintiffs filed this action to enjoin OTS from breaching the terms of the 1987 conversion agreement. Specifically, the plaintiffs seek to enjoin OTS from breaching the conversion agreement, particularly that part of the agreement allowing Security Federal to include its deferred loan losses as a component of its regulatory capital.[1]

---

1. In their motion for a preliminary injunction, the plaintiffs seek to enjoin OTS from various activities, including the appointment of a receiver for Security Federal. At the hearing, however, the plaintiffs clarified that their motion was simply to require OTS to honor the 1987 conversion agreement.

To prevail on a motion for a preliminary injunction in this circuit, a plaintiff must prove: (1) a substantial likelihood of success on the merits; (2) irreparable injury; (3) that the balance of interests weigh in favor of the plaintiff; and, (4) that the injunction would be in the public interest. *See United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir.1983).

(1) *Substantial likelihood of successor on the merits.* The plaintiffs contend that they are likely to prevail on the merits in this case because FIRREA did not abrogate, nor did it give OTS the authority to abrogate, existing contracts between the FHLBB and financial institutions. The plaintiffs point out that the Act does not abrogate such FHLBB agreements, but, instead, preserves them. They have cited several recent decisions of other district courts, including *Far West Federal Bank v. Director, Office of Thrift Supervision*, 738 F.Supp. 1564 (D.C.Ore.1990), in support of their position. The plaintiffs also rely on the findings of Judge Hull in *Franklin Federal Savings Bank v. Director, Office of Thrift Supervision, et al.*, No. 2–90–166, 1990 WL 123145 (E.D.Tenn., order, Jul. 16, 1990), and the findings of Judge Quackenbush in *Sterling Savings Association v. Ryan*, No. CS–90–175, (E.D.Wash., transcript of hearing, Jul. 3, 1990).

OTS contends that the 1987 conversion agreement was not a contract between Security Federal and FHLBB, but was, instead, merely a capital forbearance. Moreover, according to OTS, FIRREA gave it the authority to abrogate capital forbearances given by FHLBB.[2] OTS relies on the findings of Judge Hudspeth in *El Paso Savings Association v. Director, Office of Thrift Supervision*, No. EP–89–CA–426–H, (W.D.Tex., Order, Dec. 1, 1989), and the findings of Judge Thompson in *Flagship Federal Savings Bank v. Wall*, No. 90–0079–GT(BTM), (S.D.Cal., Order, Feb. 14, 1990).

The evidence in this case strongly indicates to me that Security Federal bargained for, and received, a promise from the government that its unamortized deferred loan losses would be treated as a component of its regulatory capital for a period of approximately 215 months. In exchange for this promise, the directors invested $3.6 million. The government avoided having to place Security Federal into receivership, with an attendant expected loss for the FSLIC. There was a quid pro quo. The plaintiffs are correct that the 1987 conversion agreement bears all the indicia of a contractual agreement, even though it was consummated in the context of a regulatory approval process. The agreement was not mere administrative decision-making or forbearance of enforcement.

I have carefully reviewed FIRREA and considered the arguments raised in this case. I have also examined the cases cited by both the plaintiffs and the defendant. I conclude that FIRREA does not authorize OTS to unilaterally abrogate the contract between FHLBB and the plaintiffs.

Without any doubt, Congress was fully aware of existing capital forbearance and agreements when it enacted FIRREA. If Congress addressed the issue of whether such forbearances and agreements would or would not remain in effect under FIRREA, it did so in Sections 401(g) and (h).

Section 401(g) of FIRREA provides that the abolishing of the FHLBB "shall not affect the validity of any right, duty, or obligation ..." existing on the part of the United States, the FHLBB, or "any other person" at the time of FIRREA's enactment. Section 401(h) of FIRREA provides that "subject to Section 402, all orders, resolutions, determinations, and regulations" existing at the time of enactment "shall continue in effect ... until modified, terminated, set aside, or superseded in accordance with applicable law...."

---

**2.** OTS also argues that this court lacks subject matter jurisdiction because Congress has not waived its sovereign immunity in cases such as the instant case. I disagree. FIRREA expressly states that the Director of OTS may be sued in

U.S. District Court, except for money damages, "with respect to any matter under this section, or any other applicable law or regulation ..." 12 U.S.C. § 1464(d)(1)(A) (1989). This court has subject matter jurisdiction.

From the plain language of these two sections, I find them to be neither repetitive nor contradictory. Each applies to different situations. Accordingly, I construe Section 401(g) as preserving any "right, duty, or obligation," existing as of the abolishment of the FHLBB; i.e., they will be unaffected by the abolishment. These rights, duties, or obligations may, or may not be, founded on the "orders, resolutions, determinations, and regulations" which are subject to future modification or termination "in accordance with applicable law" under Section 401(h). Thus, Section 401(g) may be construed to preserve a right claimed by Security Federal under the type of agreement entered into in this case—that is, an agreement outside the administrative rule-making or regulation theater. Section 401(h), on the other hand, continues under FIRREA the orders, resolutions, determinations, or regulations promulgated by the FHLBB, the FSLIC, and the courts, pursuant to previously existing authority. However, these orders, regulations, etc. may be "modified, terminated, set aside, or superseded" after FIRREA takes effect if done "in accordance with applicable law." Therefore, if the Security Federal conversion agreement regarding regulatory capital would have been subject to being unilaterally modified or set aside by the FHLBB under the pre-FIRREA laws, or if FIRREA specifically authorizes OTS to do so, then (and only then) Security Federal may be subjected to the new regulatory capital requirement.

On the basis of the record before me, however, it appears that the agreement in question here was a contract, and not merely a regulatory forbearance, which was binding upon the FHLBB. It follows that the FHLBB could not, as a part of its rule-making or regulatory decision-making, unilaterally terminate or set aside the agreement under prior applicable law.[3] Therefore, Security Federal has a "right" and the FHLBB an "obligation" within the

meaning of Section 401(g) which are being "affected" by the abolishment of the FHLBB. The question then remaining is whether FIRREA constitutes legislative authority under Section 401(h) for OTS to do what the FHLBB (if it still existed) would be unable to do. I have found no specific authority in the Act, and the defendant has been unable to point to any such provision. Instead, the general tenor of FIRREA is to indicate congressional approval of some pre-existing agreements and of a case-by-case analysis.

For example, although the defendant points out that FIRREA applies uniformly to all thrifts, I note that FIRREA also allows OTS to determine capital requirements on a case-by-case basis. *See* 12 U.S.C. § 1464(s)(2) (1989). Thus, Congress contemplated the need for exceptions to the more stringent capital requirements mandated by FIRREA. It also apparently approved certain pre-existing plans for both state and federal savings and loan associations, even if less formally documented than Security Federal's. [*See* § 302 of FIRREA].

To be sure, Congress was concerned about the thrift "crisis," and FIRREA constitutes a sweeping reform of lax statutory and regulatory authority that led to the "crisis." But even though FIRREA gives OTS broad regulatory power over the thrift industry, I agree with Judge Panner that, "Congress could not have intended a result so unjust and inequitable as the complete abrogation of a long-term, comprehensive agreement on which private third parties relied to invest large sums of money. To abrogate such an agreement would practically guarantee that potential investors will look elsewhere." *Far West Federal Bank v. Director, Office of Thrift Supervision, supra*, 738 F.Supp. 1564 (D.C.Ore. 1990). For these reasons, I conclude that the plaintiffs have established a substantial

---

**3.** I recognize that the application of "estoppel" or "retroactive lawmaking" with regard to an administration action upon which there has been specific reliance is both complex and unsettled. *See, e.g.,* 4 K. Davis, *Administrative Law Treatise,* §§ 20:1–20:12 (1983). The plain-

tiffs have not argued (at least directly) such application here, and I decline to consider it at the preliminary injunction stage. Nevertheless, as expressed in the text, a weighing of equities in this case tilts strongly in favor of the plaintiffs.

likelihood of success on the merits in this case.

(2) *Irreparable injury.* The plaintiffs maintain that the damages suffered as a result of OTS's refusal to honor the 1987 conversion agreement are extensive and irreparable. Of course, the magnitude of potential damages is not necessarily relevant as long as the damages are monetary and can be ascertained with some degree of certainty. *See, e.g., Northeastern Florida Chapter of the Ass'n of General Contractors of America v. City of Jacksonville,* 896 F.2d 1283, 1285 (11th Cir.1990). In this case, I conclude that the damages attributable to OTS would be extremely difficult to quantify; separating the damages attributable to OTS from the damages attributable to historic and current market variables would be difficult at best. In addition, the damage to Security Federal's business reputation would probably be fatal to its ability to continue as a separate financial institution. If that constitutes a "taking" or "confiscation" actionable in the Court of Claims, the damages may be difficult to quantify. If not actionable in the Court of Claims, then the plaintiffs' injury is irreparable—period. I also note that the damages in this case appear to be imminent: OTS has informed the plaintiffs that the consent agreement scheduled to be presented to the plaintiffs would give OTS the authority to completely manage, or even liquidate, the assets of Security Federal. Irreparable injury has been established.

(3) *Balance of interests.* On the record as it now stands, the equities in this case weigh strongly in favor of the plaintiffs. The plaintiffs invested large sums of money with the understanding that the government would honor its agreement. Plaintiffs investment would, in all likelihood, be lost if the OTS proceeds as indicated. On the other hand, the interest advanced by allowing OTS to proceed is not well defined, but is generally in the nature of uniformity of regulation and culling out the weaker institutions.

(4) *Public interest.* The public has a significant financial interest in the proper management of the bail-out of the savings and loan industry. OTS presumably has the expertise to manage that task, and generally the courts should defer to OTS on these matters. There is certainly no guarantee in this case that Security Federal will avoid insolvency at some future date when the costs to the taxpayer will be more than it would be at the present time. On the other hand, the plaintiffs' maintain that Security Federal is well-managed, has demonstrated an ability to operate profitably with the added capital provided by the plaintiffs, and should be able to turn itself around if given the opportunity to do so. In which case, the public interest would be best served by allowing Security Federal to continue to operate. At this stage of the proceedings, I cannot determine whether Security Federal will be able to avoid receivership in the near future. Certainly there are many other aspects of OTS authority, besides the components of regulatory capital, that will allow OTS to monitor Security Federal's viability. In any event, I conclude that the public interest is best served by requiring the government to honor its obligations. This promotes certainty in the market and encourages private individuals and business entities to invest in regulated institutions.

For these reasons, and the reasons previously stated at the hearing, I conclude that the plaintiffs are entitled to a preliminary injunction. A separate injunction order will be entered.

DONE AND ORDERED.

## PRELIMINARY INJUNCTION ORDER

Pursuant to the findings set out in the memorandum opinion of this same date, and after a hearing in accordance with Rule 65, Federal Rules of Civil Procedure, the Office of Thrift Supervision is hereby ENJOINED from enforcing against the plaintiffs any regulatory capital requirements inconsistent with the 1987 conversion agreement for Security Federal Savings Bank of Florida. This injunction will become effective upon the deposit of a $30,000 cash bond by the plaintiffs with the

Clerk of this Court, and will remain in effect until further order of this Court.

DONE AND ORDERED.