David L. CAIN, et al., Plaintiffs,

and

**Federal Deposit Insurance Corporation, Plaintiff–Intervenor,**

v.

**The UNITED STATES, Defendant.**

No. 95–499–C.

United States Court of Federal Claims.

July 26, 2002.

Emmett B. Lewis, Washington, DC, counsel of record for plaintiff, with whom were Patrick P. deGravelles and Duncan N. Stevens.

Andrew Gilbert, Washington, DC, counsel of record for plaintiff-intervenor.

Delisa M. Sanchez, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant, with whom were Jeanne E. Davidson, Deputy Director; David M. Cohen, Director; and Stuart E. Shiffer, Deputy Assistant Attorney General. Scott Austin, of counsel.

## OPINION

DAMICH, Judge.

This *Winstar*-related case arises from the passage of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 and the promulgation of regulations that implemented the Act. Plaintiffs David L. Cain *et al.* ("Individual Plaintiffs"), shareholders of the failed Security Federal Savings Bank ("Security Federal"), and the Federal Deposit Insurance Corporation ("FDIC"), successor-in-interest to Security Federal, both separately claim that Defendant breached a contractual obligation to them when, in the course of implementing FIRREA, the Office of Thrift Supervision ("OTS") prohibited Security Federal from counting supervisory goodwill and deferred loan losses ("DLLs") toward its regulatory capital requirements. The Individual Plaintiffs, collectively, and the FDIC each claim to be the proper contracting party with Defendant. The Individual Plaintiffs are some of Security Federal's officers and directors who became investors in Security Federal when it converted into a corporation. In several dispositive motions, Defendant has alleged that neither the Individual Plaintiffs nor the FDIC possess standing to pursue any claim related to the OTS's disallowing Security Federal to count DLLs and goodwill towards its regulatory capital requirements. This case was transferred before this Court on February 1, 2002. Oral argument on standing issues was held on April 18, 2002. For the reasons enumerated below, neither party possesses standing to pursue these claims. Accordingly, Defendant's motion to dismiss the Individual Plaintiffs, dated May 14, 1997; Defendant's Supplemental motion to dismiss the Individual Plaintiffs, dated October 10, 2000; and Defendant's motion to dismiss Plaintiff FDIC, dated October 26, 2000, are GRANTED in part. Plaintiff FDIC's motion for adjudication of claim ownership dated March 4, 2002; Plaintiff FDIC's motion for summary judgment on liability, filed October 10, 2000; and Plaintiff FDIC's motion for summary judgment on Defendant's statute of limitations defense, filed January 11, 2001, are DENIED. The Individual Plaintiffs' "short form" motion for partial summary judgment as to liability, filed March 3, 1997, is DENIED.

## I. Background

### A. Pre–Conversion Events

Security Federal, the failed thrift at issue in this case, was originally known as Security Federal Savings and Loan Association of

Panama City and was chartered in 1953 as a mutual institution owned by its depositors.

The thrift industry as a whole suffered enormous losses in the late 1970s and early 1980s caused by rising interest rates that created a significant gap between the rate of return from traditional 30–year long-term fixed mortgages and the interest payments that thrifts paid to depositors. The crisis that affected the savings and loan industry as a whole is discussed in *United States v. Winstar*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). In response, the Federal Home Loan Bank Board ("FHLBB") permitted thrifts to sell those long-term loans that provided them only with low-yield interest and to defer and amortize a portion of the losses over the original loan period. *See* 46 Fed.Reg. 50048 (Oct. 9, 1981). The unamortized portion of the loan losses could be counted towards the thrifts' regulatory capital requirements. Individual Pls.' Opp'n to Def.'s Supp. Mot. to Dismiss ("Individual Pls.' Opp'n.") at App. 30–36, 38. In 1982, Security Federal sold most of its low-yield loans, which generated a $ 4.25 million loss. Security then amortized a portion of its DLLs and also began counting a portion of its unamortized DLLs as a component of its regulatory capital as provided by FHLBB regulations. *Security Fed. Sav. Bank of Fla. v. Dir., Office of Thrift Supervision*, 747 F.Supp. 656 (N.D.Fla.1990).

However, Security Federal's financial condition continued to deteriorate. In 1985, the FHLBB notified Security Federal that it did not meet its minimum net worth requirements in its June 1985 quarterly report and requested Security Federal to submit a three year business plan to shore up its capitalization. Pl. FDIC's Mot. for Summ. J. ("Pl. FDIC's Mot.") at App. 1. On August 26, 1985, the FHLBB examined Security Federal and subsequently notified it that it had performed poorly in its examination and barely met its minimum net worth requirements. Pl. FDIC's Mot. at App. 2. In response, Security Federal considered the possibility of converting to a stock institution in order to obtain additional capital. Pl. FDIC's Mot. at App. 7, 14, 17. On December 31, 1986, at a special meeting, the board of directors of Security Federal adopted a Plan of Conversion and gave Security Federal's president, Laurence Hardee, authority to negotiate and "take any and all such action as [he] may deem necessary or desirable in order to implement the Plan of Conversion and the transactions contemplated thereby ..., to prepare and file an Application for Approval of Conversion (Form AC) with the Federal Home Loan Bank Board ..., and to take any and all such other action as is or may be necessary or required in connection with such filing." Pl. FDIC's Mot. at App. 34.

## B. The Supervisory Conversion

The financial health of the thrift continued to decline because Security Federal incurred several loan losses that left it with a negative net worth of $747,000. Pl. FDIC's Mot. at App. 48. On January 30, 1987, Mr. Hardee, on behalf of Security Federal, wrote, responding to an earlier letter from the FHLBB to Security Federal raising concerns about its net worth, that it was preparing a proposal to convert from a mutual association to a stock institution. Pl. FDIC.'s Mot. at App. 53.

On February 17, 1987, Security Federal, through the law firm of Morgan, Lewis & Bockius, submitted an application to the FHLBB to convert it from a mutual to a stock form of ownership, with the stock of the institution to be acquired by the individual plaintiffs in this action who were some of Security Federal's officers and directors. Pl. FDIC.'s at App. 55–56. The application for approval of conversion was signed by Laurence A. Hardee on behalf of Security Federal as "Director, President and Principal Financial Officer (Duly Authorized Representative)". Pl. FDIC's Mot. at App. 58. The Plan of Conversion, attached to Security Federal's application, specifically provided that certain "Directors and Officers of [Security Federal] ... shall purchase all of the shares of the Conversion Stock, and therefore shall hold 100% of the Conversion Stock following the Conversion. The Purchase Price shall be $10.00 per share of Conversion Stock, for an aggregated offering price of $3,600,000." Pl. FDIC's Mot. at App. 67. Security Federal, in its business plan, gave

the following reason for the purchase of stock by its directors and officers:

On the issue of conversion, we currently have a negative GAAP net worth and, therefore, question the availability of a public offering to [Security Federal]. In fact, the management and directors of Security Federal do not believe that a public offering would be successful in raising additional capital.

It appears that the best option for Security Federal to dramatically increase net worth is through the injection of capital by the sale of stock to affiliated persons. We believe this type of conversion would ensure the future viability and success of the institution by eliminating a major problem of [Security Federal]—inadequate capital.

Pl. FDIC's Mot. at App. 119.

Security Federal intended that the capital infusion would result in an increase in capital to 3 percent of its outstanding liabilities as measured on a Generally Accepted Accounting Principles ("GAAP") basis and raise Security Federal's regulatory net worth to 7 percent of its outstanding liabilities. Pl. FDIC's Mot. at App. 120.

Initially, the FHLBB advised the Individual Plaintiffs that Security Federal did not qualify for a supervisory conversion because the conversion, according to the submitted proposal, would be accounted according to an historical accounting method instead of a "push-down" accounting basis. Pl. FDIC's Mot. at App. 130. The relevant difference between the two accounting methods for this case is that the use of "push-down" accounting would have eliminated the ability of Security Federal to count DLLs towards regulatory capital. If the historical accounting method were used, however, Security Federal still would have been able to count DLLs towards regulatory capital. As of December 31, 1987, Security Federal was still counting $3.325 million in DLLs towards regulatory capital. The elimination of DLLs would offset the amount of capital resulting from the $3.6 million cash infusion by the Individual Plaintiffs in the conversion resulting in an increase of net worth of only $243,000, thereby defeating the purpose of the conversion. Pl. FDIC's Mot. at App. 153–54.

During the period of negotiation, the Morgan Lewis law firm, on behalf of Security Federal, submitted several amendments to the proposed conversion. Pl.'s Mot. at App. 142–43, 144–47, 155–57. With respect to the disagreement on the accounting treatment issue, Amendment 3, filed on July 2, 1987, added "an opinion of Security Federal's accountant, Deloitte Haskens & Sells, explaining its position with respect to the appropriate accounting treatment for this transaction." Pl. FDIC's Mot. at App. 156. Negotiations by correspondence took place between the FHLBB and Security Federal through its counsel. Pl. FDIC's Mot. at App. 129–35, 151–52, 158–59, 160–61, 162–63, 164–67. Eventually, Security Federal and the FLHBB agreed that the conversion would use the push-down accounting method, but that Security Federal would be permitted to carry forward its DLLs as a special component of regulatory capital and that the DLLs could be amortized in accordance with current regulations. Pl. FDIC's Mot. at App. 162–63, 176–77.

On December 23, 1987, the FHLBB issued a letter to Security Federal's board of directors approving Security Federal's conversion from a mutual institution to a stock institution Pl. FDIC's Mot. at App. 201–04. In the approval letter, the FHLBB deemed the conversion "necessary to prevent the probable failure of" Security Federal. Pl. FDIC's Mot. at App. 202. The FHLBB's Approval contained the following provision:

That within 30 days after consummation of the conversion, the New Association shall furnish analyses satisfactory to the Supervisory Agent and the Director of [the Office of Regulatory Policy, Oversight and Supervision] accompanied by a concurring opinion from its independent public accountant, that the transaction was consummated in accordance with generally accepted accounting principles using "push down" purchase accounting, which (a) specifically describes, as of the effective date of the acquisition, any intangible assets including goodwill, and the discount of assets arising from the acquisition to be recorded; (b) substantiates the reasonableness of amounts attributed to intangible

assets and the discount of assets and the related amortization periods and methods; and (c) includes a list of all adjustment made and the rates used for calculation;
. . . .

Pl. FDIC's Mot. at App. 203.

At the same time the FHLBB allowed Security Federal, upon the satisfaction of certain conditions, to carry forward its DLLs and count them towards the regulatory capital requirements that, in the absence of this specific provision, would have been lost through the application of "push-down accounting." The provision stated as follows:

> The New Association is hereby allowed to carry forward the "deferred loan losses", as defined in Part 563c.14, reported as of the date of consummation of the conversion as a special component of its regulatory capital, provided that the "deferred loan losses" be amortized in accordance with currently prevailing regulations, and that the institution make an income statement and reconciliation to include this amortization expense in calculating net income for the purposes of determining the stock repurchase and the dividend payment restrictions of Part 563b.3(g) of the Insurance Regulation and condition 7 herein.

Pl. FDIC's Mot. at App. 204.

The approval letter also restricted the ability of Security Federal to pay dividends to its shareholders. Pl. FDIC's Mot. at App. 203–04. In accordance with the terms of the approval letter, the shareholders signed an agreement, on behalf of Security Federal, restricting the ability of the thrift to pay dividends. Individual Pls.' Mot. for Partial Summ. J. at Ex. 2, L.

The conversion took place on March 21, 1988. In accordance with the conversion, the officers and directors invested $3.6 million for stock in the newly chartered thrift of which the Individual Plaintiffs paid $3.425 million. Individual Pls.' Opp'n at App. 96–98, 102–03. According to an examination of Security Federal by the FHLBB, conducted on October 28, 1988:

> On March 21, 1988, Security Federal Savings Bank of Florida completed a voluntary supervisory conversion whereby 360,-

000 shares of common stock were issued and purchased by the directors and officers of the institution. From the proceeds of the issued stock, $360,000 was allocated to common stock and $3,129,142, which is net of conversion costs of $110,858, was allocated to additional paid-in capital. The consideration paid, including the market value of liabilities assumed, exceeded the market value of the assets by $3,655,608 and was reported as goodwill.

Pl. FDIC.'s Mot. at App. 285.

The same examination reported that, as of June 30, 1988, Security Federal recorded and counted towards regulatory capital, $3,471,193 in supervisory goodwill, as well as $3,233,588 in DLLs. Pl. FDIC's Mot. at App. 289. According to an FHLBB examination at the time of the conversion, the minimum regulatory capital requirement of Security Federal was $3,559,000, which was exceeded by $3,456,081 as of June 30, 1988. *Id.* On December 2, 1988, Security Federal received from FHLBB the Federal Stock Charter for the new Security Federal Savings Bank of Florida, executed on March 21, 1988. Pl. FDIC's Mot. at App. 308–19.

On August 9, 1989, FIRREA was enacted into law. Among other things, FIRREA abolished the FHLBB and created the Office of Thrift Supervision ("OTS"), which was responsible for the regulation and supervision of all federally insured thrifts. FIRREA also restricted the ability of thrifts to count intangible assets, including DLLs and goodwill, towards their regulatory capital requirements. 12 U.S.C. § 1464(t). FIRREA also mandated OTS to promulgate "uniform accounting standards" which required thrifts to report capital in accordance with GAAP. 12 U.S.C. § 1463(b)(2).

On November 7, 1989, OTS issued regulations that prohibited the use of DLLs as assets for the purpose of computing regulatory capital requirements. 12 C.F.R. § 563.13 (1989). Shortly thereafter, on November 15, 1989, OTS informed Security Federal that it was not in compliance with minimal capital standards and required it to submit a capital plan demonstrating how it intended to remain in compliance with such standards. Def.'s Mot. to Dismiss Pl. FDIC at App. 125–

26. On February 26, 1990, in response to a letter from Security Federal as to whether its DLLs and supervisory goodwill would continue to be counted towards regulatory capital, Susan Andrews, the OTS Supervisory Examiner, confirmed that Security Federal's DLLs and supervisory goodwill would no longer be counted towards regulatory capital. Pl. FDIC's Mot. at App. 321. On April 27, 1990, OTS placed lending restrictions on Security Federal operations. Def.'s Mot. to Dismiss Pl. FDIC at App. 136–38. Subsequently, on June 1, 1990, Security Federal's capital plan was denied because Security Federal intended to continue including its DLLs in calculating its minimum capital requirements. Def.'s Mot. to Dismiss Pl. FDIC at App. 139–41.

Subsequently, Security Federal filed a complaint against OTS in the U.S. District Court for the Northern District of Florida in which it claimed that the FHLBB's approval of the conversion of Security Federal from a mutual to a stock corporate form and its granting of the ability of Security Federal to count DLLs towards regulatory capital constituted a contractual obligation that was breached by OTS and sought damages. In addition, Security Federal sought an injunction precluding OTS from imposing or enforcing any restrictions against Security Federal that were based upon any regulatory capital computations that were permitted by the conversion approval letters of OTS, which Security Federal characterized as a contract. In a bench ruling on July 25, 1990, and in a written order dated August 10, 1990, the district court entered a preliminary injunction enjoining OTS "from enforcing against the plaintiffs any regulatory capital requirements inconsistent with the 1987 conversion agreement for Security Federal Savings Bank of Florida." *Security Federal Savings Bank of Florida v. Director, Office of Thrift Supervision*, 747 F.Supp. 656, 660 (N.D.Fla. 1990). Accordingly, the preliminary injunction enjoined OTS from eliminating DLLs from the computation of regulatory capital.

However, Security Federal's financial condition continued to deteriorate, and it failed to meet all of its regulatory capital requirements, even when DLLs were counted. On January 31, 1992, OTS seized Security Federal and appointed the Resolution Trust Corporation ("RTC") as receiver for Security Federal and created a new Federal mutual savings association, Security Federal Savings Association, Panama City, Florida ("SFSA"). Pl. FDIC's Mot. at App. 324–29. The OTS at the same time placed SFSA in conservatorship under the management of the RTC. Pl. FDIC's Mot. at App. 331. SFSA acquired most of the assets and liabilities of Security Federal pursuant to a purchase and assumption agreement between the RTC, as receiver of Security Federal, and SFSA. Among the assets transferred were Security Federal's claims against the Government arising from 1987 conversion. Pl. FDIC's Mot. at App. 332–49. The RTC, after being substituted as the real party in interest for Plaintiff Security Federal in the district court action, Def.'s Mot. to Dismiss Pl. FDIC at App. 206–08, entered into a stipulation voluntarily dismissing its claims against the OTS with prejudice. Def.'s Mot. to Dismiss Pl. FDIC at App. 209–10.

On May 6, 1994, the OTS replaced the RTC, as conservator of SFSA, with the RTC as receiver for SFSA to wind up the affairs of the thrift. Pl. FDIC's Mot. at App. 350. On the same day, RTC, in its corporate capacity ("RTC–Corporate") purchased SFSA's remaining assets from the RTC as receiver in a contract of sale. These assets included claims against the Government related to the 1987 conversion. Pl. FDIC's Mot. at App. 351–63.

The RTC expired by operation of law on December 31, 1995. 12 U.S.C. § 1441a(m)(1). All assets and liabilities of RTC–Corporate were transferred to the FSLIC Resolution Fund ("FRF"). 12 U.S.C. § 1441a(m)(2). The FDIC manages the FRF and appears in this case in this capacity. 12 U.S.C. § 1821a(a); FDIC Compl. ¶¶ 7, 9. According to a report of the FDIC's Division of Finance, the receivership was "inactivated" prior to the FDIC's involvement in the current litigation, and the FRF's claim was written off. Def.'s Mot. to Dismiss Pl. FDIC at App. 228.

Plaintiff FDIC, as manager of the FRF, presents claims in this case in the amount of

$2.2 million, which includes $1.054 million for the real value of Security Federal's goodwill and $1.11 million for the real value of Security Federal's DLLs at the time of the conversion. Def.'s Opp'n to Pl. FDIC's Mot. for Adjudication of Claim Ownership at Ex. 1, Tables 1–2. The FRF also holds a claim against the receivership of Security Federal in excess of $23 million. Def.'s Opp'n to Pl. FDIC's Mot. for Adjudication of Claim Ownership at Ex. 2.

## II. Standard for Motion to Dismiss for Lack of Jurisdiction

"[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); accord *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989). However, when challenged by a motion to dismiss under RCFC 12(b)(1), a plaintiff bears the burden of proving the soundness of its allegations of jurisdiction. *Reynolds v. Army and Air Force Exchange Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988). If the Court finds that a plaintiff has not proven sufficient facts to establish that it has jurisdiction to hear the plaintiff's claim, dismissal is required. *Thoen v. United States*, 765 F.2d 1110, 1116 (Fed.Cir.1985).

## III. Individual Plaintiffs Are Not in Privity of Contract with the Government

The Individual Plaintiffs argue that, as investors in the conversion of Security Federal to a corporation, they have either a direct contract claim against the Government or, in the alternative, are third-party beneficiaries of a contract between Security Federal and the Government. The Individual Plaintiffs have not asserted derivative claims for the benefit of Security Federal. Defendant argues that this Court does not have jurisdiction to hear the Individual Plaintiffs' claims because they lack privity of contract with the Government either as direct parties or as third-party beneficiaries. Plaintiff FDIC has moved that the Court rule that the

damages sought by the Individual Plaintiffs are suffered by the Thrift, and that any claim sought by the Individual Plaintiffs is a derivative claim.

### A. Direct Breach–of–Contract Claim

■ The Tucker Act, 28 U.S.C. § 1491, provides that this court possesses jurisdiction on a claim "founded" upon a contract with the United States. In order to invoke jurisdiction, a plaintiff must establish that it is the proper party to maintain a cause of action and possesses privity of contract with the Government. *Erickson Air Crane Co. v. United States*, 731 F.2d 810, 813 (Fed.Cir. 1984). In order for shareholders of a corporation to establish privity of contract with the Government as direct parties, "the wrong must amount to a breach of duty owed to the stockholder personally, and independently of his or her status as a stockholder." *Robo Wash, Inc. v. United States*, 223 Ct.Cl. 693, 697, 1980 WL 13154 (1980).

■ The Individual Plaintiffs maintain that they have direct contractual claims against the Government. They maintain that the Government had a duty to permit Security Federal to count DLLs towards regulatory capital and that the duty ran towards the Individual Plaintiffs because, as investors, they provided $3.6 million into the conversion of Security Federal as consideration for the contract. They also claim that the Government's contractual duty ran to the Individual Plaintiffs because the FHLBB entered into lengthy negotiations with the Individual Plaintiffs and that the letter from the FHLBB that approved the conversion of Security Federal was addressed to some of the Individual Plaintiffs at their personal residences.

In some circumstances, this Court has held that investors can have direct claims against the Government in *Winstar*-related cases. In *Bluebonnet Sav. Bank, F.S.B. v. United States*, 43 Fed.Cl. 69, 73–74 (1999), *rev'd and remanded on other grounds*, 266 F.3d 1348 (Fed.Cir.2001), the owner of a bank holding company was held to have direct claims against the Government because "the glue to this transaction" involving the purchase of failing thrifts by a holding company was "the

agreement of the FLSIC to provide case assistance and certain forbearances in exchange for [the owner of the holding company's] capital and management commitment." *Id.* at 73. *See also Westfed Holdings, Inc. v. United States,* 52 Fed.Cl. 135, 145 (2002). In the *Landmark* portion of *Cal. Fed. Bank v. United States,* 39 Fed.Cl. 753, 774–75 (1997), *vacated in part on other grounds,* 245 F.3d 1342 (Fed.Cir.2001), *cert. denied* 534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 884 (2002), this Court held that, in the context of a merger between two thrifts, the acquiring shareholders of an institution that converted to a stock ownership form had direct claims against the Government for breach of contractual obligations relating to the accounting treatment that would be accorded the new institution. The Individual Plaintiffs also cite *Eden v. Miller,* 37 F.2d 8, 9 (2d Cir.1930) for the proposition that a shareholder has a direct contract claim against a breaching party if the plaintiff pays money to form a new corporation, the parties who formed and invest their money in reliance on a promise to give the business both financial and personal aid. However, unlike in *Eden,* the Individual Plaintiffs in the present case did not invest in a start-up company. Security Federal existed as a thrift prior to its conversion with the same assets, board of directors, and management.

Notwithstanding the fact that this Court has found that, in some circumstances, an acquiring shareholder may be in privity of contract against the Government, the pertinent facts in this case are indistinguishable from that of *First Hartford Corp. Pension Plan & Trust v. United States,* 42 Fed.Cl. 599 (1998), *aff'd,* 194 F.3d 1279 (Fed.Cir. 1999), which is controlling in this Circuit. In *First Hartford,* like the present case, the plaintiff was a shareholder in a bank that converted from a mutual association to a stock corporation for the purpose of recapitalization. *First Hartford,* 42 Fed.Cl. at 601. The plaintiff purchased shares of stock in the bank after the conversion, as in the present case. The bank was permitted by the FDIC in an agreement to amortize its goodwill arising from the conversion and count it towards regulatory capital, just as in this case Security Federal was permitted by FHLBB

in an approval letter to amortize goodwill and DLLs and count them towards regulatory capital. *Id.* at 602. Subsequently, The Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. No. 102–242, 15 Stat. 2236 (1991) ("FDICIA") was enacted which, like FIRREA, deprived the bank of the ability to count goodwill towards regulatory capital and, as a consequence, the bank was unable to meet its regulatory capital requirements. *Id.* at 602–03.

The Federal Circuit ruled that the plaintiff, as shareholder, did not possess standing to bring direct claims against the Government because it was not in privity of contract with the Government. *First Hartford,* 194 F.3d at 1289. Specifically, the Agreement at issue was entered into by the bank and not the shareholder. The Federal Circuit noted that:

> one of the principal motivations behind utilizing the corporate form is often the desire to limit the risk of ownership to the amount of capital invested and thus avoid the obligations, contractual or otherwise, of the corporation. Consequently, First Hartford and other similarly situated shareholders may not bring breach of contract claims on their behalf in the Court of Federal Claims.

*Id.*

The Individual Plaintiffs cannot meaningfully distinguish their status as shareholders from that of *First Hartford* or otherwise demonstrate how they were injured independently of their status as shareholders. Although the Individual Plaintiffs point out that FHLBB's approval letter was delivered to four of the acquirers at their home addresses, that does not indicate that the FHLBB treated the acquirers as contracting parties. The FHLBB was required by regulation to give notice of the approved transaction to certain acquirers. 12 C.F.R. pt. 574 (1987). Nor does the fact that the Individual Plaintiffs may have had direct dealings with the FHLBB in their capacity as managers or directors of Security Federal indicate that they suffered a direct injury. *See Mid–State Fertilizer Co. v. Exchange National Bank,* 877 F.2d 1333, 1337 (7th Cir.1989). More to

the point, the discussions with the FHLBB regarding the terms of the supervisory conversion of Security Federal were conducted by the Morgan Lewis law firm. The fact that Morgan Lewis was retained by Security Federal and not by any of the Individual Plaintiffs shows that any injury suffered by the Individual Plaintiffs cannot be distinguished in any meaningful way from the injury suffered by Security Federal when its ability to count DLLs towards regulatory capital, as allowed by the FHLBB's approval letter, was taken away.

Although First Hartford, in the alternative, presented a derivative breach of contract claim and was permitted to proceed on the derivative claim, the Individual Plaintiffs in this case have not presented any derivative claims. Accordingly, the Individual Plaintiffs do not have standing to pursue direct breach of contract claims against the government relating to the 1987 conversion of Security Federal.

### B. Third–Party Beneficiary Status

■ The Individual Plaintiffs, in the alternative, claim that they have standing to pursue their claim as a third-party beneficiary. This claim, too, must fail in light of the Federal Circuit's ruling in *Glass v. United States*, 258 F.3d 1349, *as amended on rehearing*, 273 F.3d 1072 (Fed.Cir.2001). "In order to prove third party beneficiary status, a party must demonstrate that the contract not only reflects an express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." *Id.* at 1354. The Individual Plaintiffs cannot point to any evidence in the circumstances surrounding the 1987 conversion of Security Federal that the contract—if indeed it is one—was entered into for the purpose of directly benefitting the shareholders. It is true, of course, that shareholders will invest in a corporation with the hopes of a return on their investment. However, the mere status as a shareholder is in and of itself an insufficient basis for a third-party beneficiary relationship. The shareholders must demonstrate that the contract intended to benefit them "personally, and independently of [their] status as ... stockholder[s]." *Robo*

*Wash, Inc.*, 223 Ct.Cl. at 697. At most, the Individual Plaintiffs allege that the Government made direct promises to Security Federal to provide certain regulatory treatment, and not to the shareholders.

Accordingly, the Individual Plaintiffs do not have standing to pursue any contractual claims. Therefore, those claims are dismissed.

### IV. The FDIC's Contractual Claims Do Not Have a Justiciable Controversy with the Government

■ Because this Court has held that the Individual Plaintiffs do not possess standing to pursue any contract claims against the United States, the issue of the standing of Plaintiff FDIC can be resolved with dispatch. Plaintiff FDIC, as manager of the FRF, presents claims in the amount of $2.2 million. However, the FRF, also, holds a claim against the receivership exceeding $23 million. Following the decisions of *Landmark Land Co. v. United States*, 256 F.3d 1365, 1379–82 (2001) and *Glass*, 258 F.3d at 1355–56, it is patently obvious that the FDIC does not have standing to pursue its claims. The FDIC does not possess standing in this case because it cannot establish an adverse relationship between itself and the Government due to the fact that if the FDIC were to obtain a judgment against the Government, the claim of the receivership would result in a repayment of· any proceeds to the FRF. As such, Plaintiff FDIC's claims present a nonjusticiable intra-governmental controversy. This precedent of *Glass* and *Landmark* has been consistently followed by this Court in similar cases. *Hansen BanCorp, Inc. v. United States*, 51 Fed.Cl. 679, 681 (2002); *Admiral Fin. Corp. v. United States*, 51 Fed. Cl. 366, 367–68 (2002); *FDIC v. United States*, 51 Fed.Cl. 265, 276 (2001). Likewise this Court has consistently rejected Plaintiff FDIC's contention, as it continues to make here, that squabbling among co-plaintiffs is converted into a claim that the Court of Federal Claims possesses subject matter jurisdiction to adjudicate. *Hansen*, 51 Fed.Cl. at 681; *FDIC*, 51 Fed.Cl. at 276. Moreover, Plaintiff FDIC's argument that it possesses standing because it claims ownership of the

Individual Plaintiffs' claims is rendered moot because the Individual Plaintiffs do not possess standing to pursue their claims. Accordingly, the Court dismisses Plaintiff FDIC's contract claims against the Government relating to the 1987 conversion of Security Federal.

## V. Conclusion

Neither the Individual Plaintiffs nor Plaintiff FDIC possess standing to pursue their contractual claims relating to the 1987 conversion of Security Federal. Accordingly, Defendant's motion to dismiss the Individual Plaintiffs, dated May 14, 1997; Defendant's Supplemental motion to dismiss the Individual Plaintiffs, dated October 10, 2000; and Defendant's motion to dismiss Plaintiff FDIC, dated October 26, 2000, are GRANTED in part. Plaintiff FDIC's motion for adjudication of claim ownership, dated March 4, 2002; Plaintiff FDIC's motion for summary judgment on liability, filed October 10, 2000; and Plaintiff FDIC's motion for summary judgment on Defendant's statute of limitations defense, filed January 11, 2001, are DENIED. The Individual Plaintiffs' "short form" motion for partial summary judgment as to liability, filed March 3, 1997, is DENIED.

Because other claims, such as takings claims, have not been fully briefed, the parties are ORDERED to file a joint status report within 10 days of the entry of this opinion, which will present the Court with a proposed briefing schedule for all remaining claims in this case and three mutually agreeable dates for a status conference.