FRIEDMAN, Senior Circuit Judge.
Once again, shareholders of a failed savings and loan association (also called a “thrift”) seek damages in this Winstar-related case for the government’s breach of its alleged contract with them to permit the thrift to use an accounting method favorable to it. The United States Court of Federal Claims dismissed the shareholders’ complaint because they had not shown that they had a contract with the government. Cain v. United States, 53 Fed.Cl. 658 (2002). We affirm.
I
A. The background and consequences of the savings and loan industry’s financial crisis in the 1980’s has been frequently described and need not be repeated here. See United States v. Winstar Corp., 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996); Landmark Land Co. v. FDIC, 256 F.3d 1365 (Fed.Cir.2001); Glass v. United States, 258 F.3d 1349 (Fed.Cir.2001).
*1311 The crisis arose because the interest rates the thrifts had to pay on deposits were higher than the interest rates they received on their long-term real estate mortgages in which their capital was invested. The Federal Home Loan Bank Board (“Bank Board"), the agency that regulated the thrifts, tried to alleviate the situation by encouraging economically healthy thrifts and individuals to acquire or invest in the financially troubled institutions. To induce such acquisitions or investments, the Bank Board permitted the troubled thrifts to follow accounting practices under which their capital for regulatory purposes included losses.
In 1989, Congress reacted to this situation by enacting the Financial Institutions Reform, Recovery, and Enforcement Act (“Financial Reform Act”), Pub. L. No. 101-73, 103 Stat. 183. That Act, among other things, prohibited thrifts from employing those accounting practices.
The result was that numerous thrifts no longer complied with the regulatory capital requirements and were placed in receivership. Many of them and their stockholders filed suits against the United States to recover their losses. The cases included claims for breach of contract and Fifth Amendment takings.
In Winstar, the Supreme Court affirmed the decision of this court, 64 F.3d 1531 (1995), that “the United States is liable to respondents [three thrifts] for breach of contract.” 518 U.S. at 910, 116 S.Ct. 2432. The contracts there permitted the three failed thrifts to meet regulatory capital requirements by using a “ ‘fictional asset’ called ‘supervisory goodwill’ that represented the excess of the thrift’s liabilities over its assets,” and to amortize that “asset” over a substantial period. FDIC v. United States, 342 F.3d 1313, 1315 (Fed. Cir.2003) (quoting Landmark, 256 F.3d at 1370). Most of the Winstar-related cases we have decided also have involved such supervisory goodwill.
B. The present case involves a different but comparable accounting system. Security Federal Savings Bank (“Security Federal”), a mutual thrift owned by its depositors, in 1982 sold most of its low-interest loans at a loss of $4.25 million. Cain, 53 Fed.Cl. at 660. The Bank Board permitted the thrift to treat the loss as part of its regulatory capital requirements and to amortize part of the loss over the original loan period. Id. Despite this action, Security Federal’s financial condition continued to deteriorate. Id. The shareholders’ complaint stated: “[i]n late 1986 and early 1987, as solution to Security Federal’s capital deficiency problems, the [Bank Board] suggested that plaintiffs convert the thrift from a ‘mutual’ association to a ‘stock’ association.” Cain Pis.’ 2nd Am. Compl. 1121.
Security Federal’s board of directors adopted such a conversion plan, under which the directors would provide additional capital by purchasing the newly-issued stock. The board of directors authorized Security Federal’s president, Laurance Hardee, “to negotiate and ‘take any and all such action as [he] may deem necessary or desirable in order to implement the Plan of Conversion and the transactions contemplated thereby ..., to prepare and file an Application for Approval of Conversion (Form AC) with the [Bank Board] ..., and to take any and all such other action as is or may be necessary or required in connection with such filing.’ ” Cain, 53 Fed.Cl. at 660 (alterations in original). “[0]n behalf of Security Federal,” Hardee informed the Bank Board that “it was preparing a proposal to convert from a mutual association to a stock institution.” Id.
Security Federal’s law firm, Morgan, Lewis & Bockius, prepared and filed with *1312 the Bank Board a conversion application. Id. The application was filed for “SECURITY FEDERAL SAVINGS & LOAN ASSOCIATION OF PANAMA CITY” and was signed “BY: Laurance A. Hardee, Director, President and Principal Financial Officer (Duly Authorized Representative).” On the following page, after the word “Attest:” were the signatures of the Chairman of the Board of Directors, the Controller, a Director who also was the Secretary-Treasurer, and four other Directors.
The Bank Board initially rejected the application because the converted thrift proposed to use the historical accounting method instead of the “push-down” accounting method that Generally Accepted Accounting Principles required. Id. at 661. see 12 C.F.R. § 563b.27(p)(1987). This was significant because under “push-down” accounting, the converted thrift could not treat its loan-sale losses as part of its regulatory capital and amortize them, which it could continue to do under historical basis accounting. Cain, 53 Fed. Cl. at 661.
Extensive discussions and negotiations ensued between the law firm, which acted on behalf of the thrift, Hardee, and the regulators. It was made clear that the directors would not invest in the stock of the converted thrift unless it could continue to treat the loan losses as part of its regulatory capital. Cain Pis.’ 2nd Am. Compl. 1124. The matter was settled by the thrift agreeing to use “push-down” accounting and the Bank Board permitting the thrift to continue using the loan losses as part of its regulatory capital. Cain, 53 Fed.Cl. at 661-62.
By letter dated December 23, 1987, the Bank Board approved the conversion. The letter, addressed to the four directors who had acquired the largest number of shares and to Security Federal’s board of directors, approved the application. Id. at 661. The Bank Board also did not disapprove Notices of Change of Control of the thrift that the four principal stockholders had submitted, provided that seven specified conditions were “complied with.” Id. at 662. One of those conditions was that the four stockholders enter into an agreement with the new thrift that would limit the amount of dividends it could pay. Id. All the stockholders signed such an agreement with Security Federal. Id.
The approval letter further stated:

DEFERRED LOAN LOSSES

The New Association is hereby allowed to carry forward the “deferred loan losses,” as defined in Part 563c.l4, reported as of the date of consummation of the conversion as a special component of its regulatory capital, provided that the “deferred loan losses” be amortized in accordance with currently prevailing regulations ...
Id. Finally, the letter concluded with a “TAX CERTIFICATION.”
The letter was signed by a representative of the Bank Board’s Office of General Counsel and a representative of the Office of Regulatory Policy, Oversight and Supervision.
Security Federal converted from a mutual to a stock thrift. Id. The appellants purchased its stock for $3.425 million. Id.
Several months later, the Financial Reform Act was enacted. The Act “restricted the ability of thrifts to count intangible assets, including [deferred loan losses] and goodwill, towards their regulatory capital requirements.” Id. (citing 12 U.S.C. § 1464(t)). It also mandated regulations requiring thrifts to use Generally Accepted Accounting Principles. 12 U.S.C. § 1463(b)(2) (2000). It abolished the Bank Board “and created the Office of Thrift Supervision (‘OTS’), which was responsible *1313 for the regulation and supervision of all federally insured thrifts.” Cain, 53 Fed. Cl. at 662.
“OTS issued regulations that prohibited the use of DLLs [deferred loan losses] as assets for the purpose of computing regulatory capital requirements.” Id. “OTS informed Security Federal that it was not in compliance with minimal capital standards and required it to submit a capital plan demonstrating how it intended to remain in compliance with such standards.” Id. “Security Federal’s capital plan was denied because Security Federal intended to continue including its DLLs in calculating its minimum capital requirements.” Id. at 663.
Security Federal’s response was to file suit against OTS in the United States District Court for the Northern District of Florida. That court entered a preliminary injunction enjoining OTS “from enforcing against the plaintiffs any regulatory capital requirements inconsistent with the 1987 conversion agreement for Security Federal Savings Bank of Florida.” Sec. Fed. Sav. Bank of Fla. v. Dir., Office of Thrift Supervision, 747 F.Supp. 656, 660 (N.D.Fla. 1990).
The injunction did not save Security Federal, whose “financial condition continued to deteriorate, and it failed to meet all of its regulatory capital requirements.” Cain, 53 Fed.Cl. at 663. In January 1992, Security Federal was placed in receivership. Id.
C. Seven Security Federal shareholders (“the Shareholders”), the appellants in the present case, filed suit in the Court of Federal Claims against the United States seeking damages for breach of contract. In their second amended complaint, the Shareholders alleged that “[t]his action stems from a contract between plaintiffs and the defendant entered into as a part of the conversion of Security Federal Savings Bank of Florida (‘Security Federal’) from a mutual association to a stock company,” Cain Pis.’ 2nd Am. Compl. 112; that “[t]he documents and transactions described above ... collectively evidence and establish the contract under which the United States promised these individual plaintiffs that it would recognize deferred loan losses as capital of Security Federal for the full amortization period provided in the regulations then applicable (‘the Agreement’),” Id. H 30; and that the government had breached that contract when it precluded Security Federal from including deferred loan losses in its regulatory capital, Id. 111140-58.
Following the filing of numerous motions, including motions to dismiss and for summary judgment by the Shareholders, the court dismissed the Shareholders’ claims because the Shareholders had no privity of contract with the government. The court ruled that the Shareholders “do not have standing to pursue direct breach of contract claims against the government relating to the 1987 conversion of Security Federal.” Cain, 53 Fed.Cl. at 666. The court stated that the Shareholders could not “demonstrate how they were injured independently of their status as shareholders,” and that “any injury suffered by the [Shareholders] cannot be distinguished in any meaningful way from the injury suffered by Security Federal when its ability to count DLLs towards regulatory capital, as allowed by the [Bank Board’s] approval letter, was taken away.” Id. at 665-66.
The court concluded that the evidence upon which the Shareholders relied to show that they had entered into a contract with the government, discussed in Part II below, “does not indicate that the [Bank Board] treated the acquirers as contracting parties.” Id. at 665. Finally, the court stated that “the pertinent facts in this case are indistinguishable from that *1314 [sic] of First Hartford Corp. Pension Plan & Trust v. United States, 42 Fed. Cl. 599 (1998), ajfd, 194 F.3d 1279 (Fed.Cir.1999),” in which this court held that a shareholder of a failed thrift could not maintain a damage suit against the United States based on a similar alleged breach of contract claim because it was not in privity with the government since “the Agreement at issue was entered into by the bank and not the shareholder.” Id.
The court also rejected the Shareholders’ claim that they could maintain their suit as third party beneficiaries of a contract between Security Federal and the government. Cain, 53 Fed.Cl. at 666. The Shareholders’ appeal does not challenge that ruling.
In addition to the Shareholders’ suit, the Federal Deposit Insurance Corporation (“FDIC”), as the receiver of Security Federal, filed its own complaint in intervention on behalf of the thrift to recover damages for breach of contract. The court dismissed that complaint because it did not present any case or controversy between the FDIC and the government, since the FDIC would have to return to the government any recovery it might obtain on behalf of the thrift. Id. The FDIC appealed from that ruling but subsequently dismissed its appeal.
II
The contract that the Shareholders contend they entered into with the government allegedly was formed by (1) the Shareholders offering to invest more than $3,000,000 in the converted thrift, and (2) the Bank Board permitting the converted thrift to continue to include in its regulatory capital its deferred loan losses. The Shareholders’ theory is that the Bank Board accepted their offer and thereby created a contract by approving the conversion in its letter of December 23, 1987. The Shareholders emphasize that that letter was addressed not only to Security Federal’s board of directors but also to the four largest shareholders, including Har-dee, the thrift’s president.
This court recently noted: “For a contract to be formed once an offer is made, there must be an acceptance, i.e., a ‘manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.’ ” Anderson v. United States, 344 F.3d 1343, 1355 (Fed. Cir.2003). The record may be searched in vain for any showing of “the necessary ‘manifest assent,’ [by the Bank Board] under our precedent, to form a contract [with the Shareholders] for the extended amortization of goodwill.” Id. (footnote omitted).
The December 23, 1987 letter shows no intent by the Bank Board to enter into any contract with the Shareholders. The first two paragraphs stated that “[w]e have completed our review of the application filed ...”
to convert from a federally chartered mutual savings and loan association to a federally chartered stock savings and loan association pursuant to Section 5(i), (p) of the Home Owners’ Loan Act of 1933, as amended (“HOLA”), 12 U.S.C. Section 1464(i)(2) (1982), and Subpart C of Part 563b of the Rules and Regulations for the Federal Savings and Loan Insurance Corporation, 12 C.F.R. Sections 563b.20-563b.32, in a voluntary supervisory conversion in which the Association will issue approximately 350,000 shares of conversion common stock.
We have also completed our review of the Notices of Change of Control of the Association filed by Messrs. Hardee, Harrison, Haney and Dantzler (collectively, the “Acquirors”) for authority to acquire control of the Association pursuant to 12 U.S.C. Section 1730(q) and 12 *1315 C.F.R. Part 574, upon consummation of its conversion to stock form.
The third paragraph stated:
On the basis of the information contained in all of the afore-mentioned applications, the Office of General Counsel (“OGC”), and the Office of Regulatory Policy, Oversight and Supervision (“OR-POS”) have determined, after having made all required findings and determinations, to approve all of the aforesaid applications.
The letter continued:
The Association is hereby authorized to convert from the mutual to the stock form of organization and to adopt the proposed form of stock charter and bylaws submitted with the application, and the Acquirors’ Change-In-Control Notices regarding the acquisition of control of the Association as a result of that conversion are hereby not disapproved; provided that the following conditions are complied with to the satisfaction of the Supervisory Agent.
The letter then listed seven conditions, including that the conversion be completed within ninety days, that “counsel for the Association ... submit an opinion to the Supervisory Agent, indicating that the proposed merger did not result in any significant tax liability to the Association or the New Association,” and that within thirty days “the Acquirors and the New Association sign an agreement ... that ... dividends paid by New Association shall be limited to 50 percent of net income.”
The letter then set forth the “DEFERRED LOAN LOSSES” provision quoted in Part I B above, stating that “[t]he New Association is hereby allowed to carry forward the ‘deferred loan losses’, as defined in Part 563c,14,” on the terms specified. Finally, as noted, the letter contained a “TAX CERTIFICATION.”
The December 23 letter does not contain or provide any contractual commitment by the Bank Board to the Shareholders. Instead, on its face it constitutes and reflects no more than the Bank Board’s regulatory approval of the proposed conversion of Security Federal into a stock company. The provisions of the letter described above are typical regulatory actions — approval of the conversion of the thrift and the imposition of terms and conditions for such action, approval of the acquisition of control of the thrift by the principal Shareholders, authorization for the new association to include the deferred loan losses in its regulatory capital, and granting of a tax certification.
“An agency’s performance of its regulatory or sovereign functions does not create contractual obligations. Something more is necessary.” D & N Bank v. United States, 331 F.3d 1374, 1378-79 (Fed.Cir. 2003) (citation omitted), reh’g denied, reh’g en banc denied, 331 F.3d 1374 (Fed.Cir. 2003). Here there is nothing more than the Bank Board’s performance of its regulatory function.
The Bank Board’s addressing of the notice of approval to the thrift’s four largest shareholders can not be viewed as manifesting intent to enter into a contract with them. The obvious reason for the Board doing so was because the Board’s approval letter also authorized them to acquire control of the new association. Since those four had filed the applications to acquire control, the Bank Board naturally sent them its letter approving such acquisition. Indeed, if the Bank Board intended to enter into a contract with the Shareholders, why would it have sent the letter only to four of the seven of them?
The Shareholders also rely on an affidavit by Hardee, executed in 1997, 10 years after the events in question, that “[i]n *1316 1987, acting as President of Security Federal and in an individual capacity on behalf of [himself] and the other plaintiffs in this lawsuit,” he negotiated with the Bank Board “concerning the terms and conditions under which Security Federal would convert from a ‘mutual’ association to a ‘stock’ association owned by its shareholders, and under which the officers and directors of Security Federal, including all the plaintiffs in this action, would invest their own funds to purchase all the stock in the new corporation.” The affidavit stated that in a letter he sent to the Bank Board via Morgan, Lewis & Bockius in July 1987, he “explained] that preserving-deferred loan losses as a component of Security Federal’s regulatory capital was absolutely essential to [their] willingness to invest in Security Federal.” (emphasis in original). The letter, however, did not contain this language.
The Shareholders also point to their own affidavits (also executed in 1997) that state they “designated” Hardee “to act on [their] behalf in negotiating the terms of the conversion and the acquisition of the stock in the new institution with the [Bank Board] and other government entities.” Although these affidavits may show that a condition of the Shareholders’ investment in the converted thrift was that it be permitted to use its deferred loan losses as part of its regulatory capital, they do not show that in authorizing that practice the Bank Board entered into a contract with the Shareholders. Indeed, the Shareholders’ interest was fully protected as long as the Bank Board authorized the thrift to do so — which was precisely what it did and all that it did.
The conclusion that there was no contract between the Bank Board and the Shareholders is further supported by the application for conversion. The application was filed for Security Federal “By” Hardee, as its “Director, President and Principal Financial Officer.” Although on the following page, six of the directors (including the Chairman of the Board) and the Controller “Attested]” to the document by signing their names, that action merely reflected their attestation that they had authorized the filing of the application. It did not make them parties to the application, much less than to a contract between themselves and the Bank Board.
At oral argument the Shareholders cited seven documents in the record that, they contended, supported their claim that they had negotiated and entered into a contract with the Bank Board permitting the converted thrift to continue using deferred loan losses as part of regulatory capital. Three of those documents were letters between the Bank Board and Security Federal’s counsel, Morgan, Lewis & Bockius. Another was the dividend restriction agreement between Security Federal and the four principal shareholders, which the Board’s approval of the conversion agreement required them to enter into. Two other documents were internal memoranda between members of the Bank Board staff. The final document was the Bank Board’s December 28, 1987 letter approving the conversion, which we already have discussed.
Neither individually nor collectively do those documents support the Shareholders’ contention that they entered into a contract with the Bank Board or undermine the Court of Federal Claims’ contrary conclusion. Indeed, even “a cloud of evidence that could be consistent with a contract does not satisfy the plaintiffs burden of proving mutual intent.” First Commerce Corp. v. United States, 335 F.3d 1373, 1380 (Fed.Cir.2003) (internal quotation marks omitted).
The Shareholders also argue that the Court of Federal Claims improperly dis *1317 missed their complaint without a trial because their “complaint unquestionably alleged facts sufficient to demonstrate the existence of a contract between [themselves] and the government.” Cain Br. at 12. As we have shown, however, the record does not contain evidence that would establish a contract between the Shareholders and the Bank Board. The Shareholders point to no additional evidence they would have introduced at a trial that would show such a contract, and they make no claim that the procedure the Court of Federal Claims followed in deciding this case precluded them from introducing any additional evidence that would have produced a different result.
Of course, whether the government entered into a contract with a thrift’s shareholders necessarily turns on the facts of the particular case. Our decision in this case, however, is consistent with our prior cases in which we held that there was no contract between a thrift’s shareholders and the government. See, e.g., Castle v. United States, 301 F.3d 1328, 1339-41 (Fed.Cir.2002), reh’g denied, reh’g en banc denied, 64 Fed.Appx. 227, 2003 WL 21212568 (Fed.Cir.2003), cert. denied, — U.S.-, 123 S.Ct. 2572, 156 L.Ed.2d 602 (2003); First Hartford, 194 F.3d 1279.
The Court of Federal Claims correctly dismissed the Shareholders’ complaint.
CONCLUSION
The judgment of the Court of Federal Claims is

AFFIRMED.