Richard C. LA VAN, Carmen Lullo, Ronald S. Kraar, Donald Bialon, and James Skozek, Plaintiffs–Cross Appellants,

and

Federal Deposit Insurance Corporation, Plantiff,

v.

UNITED STATES, Defendant–Appellant.

Nos. 03–5140, 03–5149.

United States Court of Appeals, Federal Circuit.

Sept. 3, 2004.

**1342**

Bruce T. Logan, Ash, Anos, Freedman & Logan, L.L.C., of Chicago, IL, argued for plaintiffs-cross appellants.

Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With her on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General; and David M. Cohen, Director. Of counsel on the brief were Elizabeth M. Hosford and James R. Whitman, Trial Attorneys.

Before RADER, BRYSON, and LINN, Circuit Judges.

Concurring-in-part and dissenting-in-part opinion filed by Circuit Judge LINN.

RADER, Circuit Judge.

On summary judgment, the United States Court of Federal Claims held that the Government contracted with Richard C. LaVan, Carmen Lullo, and James Skozek during the conversion of Century Savings & Loan Association (CSLA) into a federally chartered stock thrift called Century Federal Savings Bank (Century), that the Government breached that contract, that the Government had to pay restitution but not expectancy or reliance damages, and that the Government was not liable under a takings theory. *LaVan v. United States,* 56 Fed. Cl. 580 (2003); *LaVan v. United States,* 53 Fed. Cl. 290 (2002). Because the trial court erred in holding that Messrs. LaVan, Lullo, and Skozek were not entitled to prove expectancy damages, this court affirms-in-part, vacates-in-part, and remands.

I.

This case relates to another fact-specific dispute following the seminal decision of *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). In the early 1980s, CSLA was a state-chartered mutual savings and loan association that began experiencing substantial financial difficulties. To prevent insolvency, CSLA decided to convert from a state mutual form of association to a federally chartered stock association. Thus, CSLA submitted an application for conversion to a federal stock charter to the Federal Home Loan Bank Board (FHLBB) on July 25, 1983. As part of its application, CSLA submitted a plan of rehabilitation that proposed conversion under the push-down method of accounting, accompanied by the sale of $350,000 of stock as new capital for the institution. The FHLBB, however, required an additional capital infusion of approximately $170,000—that is, a total of approximately $520,000—to meet post-conversion net worth requirements. In response, CSLA specifically named Messrs. LaVan, Lullo, and Skozek in addition to John Lence as the sources of the new capital for Century.

Before approving the conversion, the supervisory agent requested that the Illinois savings and loan commissioner review the transaction. Concerned about the apparent self-dealing that would preclude the use of push-down accounting under the FHLBB's Memorandum # R55, the Illi-

nois commissioner wrote that this was not an arm's-length transaction. He summed up his concerns:

The transaction on which comment is sought would convert Century from a mutual form of ownership to a stock form of ownership. After the conversion from mutual to stock, the association will still be under the same management and direction. The proposed investors—Messrs. John W. Lence, Stanley Skozek, Richard C. LaVan and Carmen Lullo—are all current officers and directors of Century. They are the same parties who are proposing the conversion. The conversion will allow these individuals to receive dividend income in addition to salaries and directors' fees. Clearly, the benefits to these insiders from this supervisory conversion are potentially substantial.

These facts alone do not conform to the arms-length criteria of Memorandum R55 for the use of push-down accounting:

"1. the circumstances surrounding the acquisition assure that it was arms-length in nature;"

Three of the "proposed investors" are current and proposed officers. All of the "proposed investors" are now directors of Century and are also "proposed investors." The perpetuation of current officers and directors as the only stockholders, post-conversion, appears to be exactly what R55 prohibits.

It is this same group of key personnel (Lence, LaVan, Lullo, and Skozek) who have managed the association during the last several years, during which it has experienced steady losses.

\* \* \*

I recommend against approval of changes in control whereby, as here, insiders (i.e., management and directors) propose, structure and survive the conversion as owners.

Despite these concerns, the FHLBB approved the conversion. The principal supervisory agent stated his reasons for approval in a letter to the FHLBB's regional director:

[T]here is no evidence that management has purposefully taken steps which contributed to the deterioration of the institution in order to qualify as a supervisory conversion, or that Century's deterioration was caused by self-dealing or negligence on the part of management. It is therefore recommended that the transaction not be interpreted as non-arm's-length in the sense prohibited by Memorandum # R–55.

Moreover, the FHLBB understood the transaction would occur at arm's length, as stated in an internal memo dated July 9, 1984:

In our opinion the arm's length condition is met as the supervisory group of the FHLBB and the purchasing group are dealing with each other in the negotiation of the transaction with their own best interests in mind. While the Commissioner may have a legitimate question about the decision to sell the converted stock to the prior management group, this does not, in our mind, preclude the use of push-down accounting by the purchasers.

As a practical matter, the accounting that will be used for the transaction is designed to facilitate the acquisition of Century by the purchasers. The purchasers are requesting a 35–year write-off period for the goodwill that arises in the transaction. This does not conform to GAAP [Generally Accepted Accounting Principles] but will conform to RAP [Regulatory Accounting Practices]

should the Board decide to approve the transaction as structured.

In conclusion, it is our opinion that push-down accounting would be permissible for this transaction and that the Board and FSLIC may approve accounting for the transaction which, although not GAAP, may be necessary to resolve the supervisory case.

On August 24, 1984, the FHLBB approved the conversion with two Board Resolutions. Two clauses in Board Resolution No. 84-448 state:

WHEREAS, Century Savings and Loan Association, Chicago, Illinois ("Century") as authorized by its board of directors by at least a majority vote, filed on July 25, 1983, with the Federal Savings and Loan Insurance Corporation ("Corporation"), an application, as last amended on June 25, 1984 ("Application"), pursuant to Subpart C of Part 563b of the Rules and Regulations for Insurance of Accounts ("Insurance Regulations"), for permission to convert from a state-chartered mutual association to a federally chartered stock association, Century Federal Savings Bank, to be controlled by John W. Lence, Stanley Skozek, Carmen Lullo and Richard C. LaVan ("Acquirors"); and

* * *

WHEREAS, The Acquirors have filed with the Corporation for review pursuant to Section 407(q) of the NHA and Section 563b.18-2(c) of the Insurance Regulations prior written notice of the proposed change in control of Century[.]

That resolution also specifies the accounting and the change in control for the conversion:

### ACCOUNTING FOR THE TRANSACTION

RESOVLVED [sic] FURTHER, That for purposes of reporting to the Board

the use of push-down accounting is approved, and Century may amortize the value of any intangible asset resulting from the accounting for the purchase over a period not to exceed 35 years by the straight-line method; and

* * *

### CHANGE IN CONTROL

RESOLVED FURTHER, That the proposed acquisition of control of Century resulting from the acquisition of its conversion stock by the Acquirors is hereby not disapproved pursuant to the provisions of Section 407(q) of the NHA and Section 563.18-2(g)(2) of the Insurance Regulations, provided that the proposed acquisition of the conversion stock is consummated before August 15, 1984, unless written approval of an extension of time has been obtained from the General Counsel, Deputy General Counsel for Policy and Corporate Structure, or the Director of the Corporate and Securities Division of the Office of General Counsel, and provided that there is no material change in circumstances[.]

Moreover, the last clause of the second resolution, Board Resolution No. 84-449, states:

RESOLVED, That the supervisory conversion of Century Savings and Loan Association, Chicago, Illinois ("Century"), from a state mutual savings and loan association to a federal stock savings bank pursuant to Subpart C of the Rules and Regulations for the Insurance of Accounts, and the acquisition of all of Century's conversion stock by John W. Lence, Stanley Skozek, Carmen Lullo, and Richard C. LaVan is hereby approved, subject to any conditions that may be imposed by the Federal Home Loan Bank Board in any concurrent res-

olution or action issued as of the date of this resolution.

On the same day of the resolutions, Century sold 52,441 shares of stock at $10 per share to Messrs. LaVan, Lence, Lullo, and Skozek, which the two Board Resolutions collectively designated as the Acquirors. Mr. LaVan acquired 39,941 shares in exchange for $399,410; Mr. Lence acquired 9,000 shares in exchange for $90,000; Mr. Lullo acquired 1,000 shares for $10,000; and Mr. Skozek acquired 2,500 shares for $25,000. After the conversion but before the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (FIRREA), Mr. Lence sold all his shares in Century.[1]

Also before the enactment of FIRREA, all shareholders of Century, including the Acquirors, entered into an agreement to sell their stock for $14.31 per share to a third-party holding company, Century Savings Bankcorp, Inc. Before the deal was consummated, however, the holding company invoked the change in circumstance provision of the contract and terminated the transaction. Following the passage of FIRREA, Century fell out of capital compliance and was placed into receivership on May 3, 1991.

The trial court held on summary judgment that the Government contracted with the Acquirors for the use of push-down accounting and the amortization of the goodwill resulting from the transaction over thirty-five years. *LaVan*, 53 Fed.Cl. at 296–302. The Court of Federal Claims also found that FIRREA breached that contract. *Id.* In a second opinion, the trial court held that the Acquirors were entitled to recover restitution but not expectancy or reliance damages. *LaVan*, 56 Fed. Cl. at 583–86. The trial court further held that the Acquirors could not recover under a takings theory. *Id.* at 586. The Government appeals the trial court's conclusions that the Government contracted with the Acquirors, challenging whether a contract was formed and, if so, whether the Acquirors have standing to sue for breach of that contract. The Acquirors' cross-appeal challenges the disallowance of expectancy damages. The Acquirors also cross-appeal the denial of liability under a takings theory.

## II.

This court reviews a grant of summary judgment without deference. *Castle v. United States,* 301 F.3d 1328, 1337 (Fed. Cir.2002). Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When deciding a motion for summary judgment, a court must draw all factual inferences in favor of the nonmovant. *Barron Bancshares, Inc. v. United States,* 366 F.3d 1360, 1368 (Fed.Cir.2004). The existence of a contract is a mixed question of law and fact. *Cienega Gardens v. United States,* 194 F.3d 1231, 1239 (Fed.Cir.1998). This court reviews contract interpretation, a question of law, without deference. *Castle,* 301 F.3d at 1337.

---

1. Because Mr. Lence is not a party to this litigation, this court uses the term "Acquirors" to mean Messrs. LaVan, Lullo, and Skozek. Additionally, two of the purchasers of Mr. Lence's shares, Ronald Kraar and Donald Bialon, were originally co-plaintiffs in this action. The trial court dismissed their claims against the Government because they acquired their shares in Century after the conversion. *LaVan v. United States,* 53 Fed. Cl. 290, 302 (2002). Messrs. Kraar and Bialon have not appealed their dismissals.

### A.

The exchanges between the Government and the Acquirors constitute a contract only if three elements are met: "mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *Cal. Fed. Bank v. United States*, 245 F.3d 1342, 1346 (Fed.Cir.2001) (quoting *Massie v. United States*, 166 F.3d 1184, 1188 (Fed. Cir.1999)). Here, the trial court determined that the parties formed an implied-in-fact contract governing the treatment of goodwill. *LaVan*, 53 Fed. Cl. at 298–99. While an implied-in-fact contract shares the same elements as a direct contract, "[a]n implied-in-fact contract is 'founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *Maher v. United States*, 314 F.3d 600, 606 (Fed.Cir.2002) (quoting *Hercules, Inc. v. United States*, 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996)).

The Government argues that this transaction lacked a mutual intent to contract. In particular, the Government argues that it was merely performing the regulatory function of approving a conversion from a state-chartered mutual association to a federally chartered stock association, citing *D & N Bank v. United States*, 331 F.3d 1374 (Fed.Cir.2003), and *Anderson v. United States*, 344 F.3d 1343 (Fed.Cir.2003). In *D & N Bank*, this court explained that "[a]lthough a contract may arise as a result of the confluence of multiple documents, there must still be a clear indication of intent to contract and the other requirements for concluding that a contract was formed." 331 F.3d at 1378. This court in *D & N Bank* looked at four separate documents but determined that none expressed the Government's intent to contract. In particular, the court remarked that "any suggestion that the government impliedly had the intent to contract as to the treatment of goodwill because of its approval of the merger is implausible because none of the documents proffered by D & N mentions goodwill or the accounting treatment thereof." *Id.* In examining the Bank Board Resolution, which was the only document indicating a promise by someone with authority, the court explained its deficiencies:

> This document, however, only shows the Bank Board's approval of the merger. Mere approval of the merger does not amount to intent to contract. The Bank Board, in its regulatory capacity, must approve all mergers. An agency's performance of its regulatory or sovereign functions does not create contractual obligations. *Something more is necessary.* The Bank Board Resolution says nothing about goodwill and there was no negotiation between D & N and the Bank Board that resulted in approval of the merger. D & N and First Federal simply submitted an application for approval of the merger, and the Bank Board accepted it.

*Id.* at 1378–79 (citations omitted) (emphasis added). The Government correctly notes in the present case that the application for conversion was required by and submitted in accordance with regulations then in force. While those allegations are true, this transaction evinces "something more."

Specifically, Board Resolution No. 84–448 clearly approves the use of push-down accounting and the amortization of goodwill resulting from the conversion over a period of thirty-five years. As evidenced by an internal memorandum, the treatment of goodwill was at the epicenter of

the conversion process. In discussing whether the transaction would occur at arm's length, the memo reflects that "the supervisory group of the FHLBB and the purchasing group are dealing with each other in the negotiation of the transaction with their own best interests in mind" and that "[t]he purchasers are requesting a 35-year write-off period for the goodwill that arises in the transaction." That memorandum clearly reflects the "something more," that is, the recognition that the government was engaged in negotiations about the terms of the conversion as well as the subsequent manifest assent to abide by the Resolution required under *D & N Bank.* Indeed, *Anderson,* which carefully evaluated this court's precedent on contract formation in the context of *Winstar* litigation, recognized that the "something more" requires, in succinct terms, that "the offeree must give in return for the offeror's promise exactly the consideration which the offeror requests and the acceptance must be made absolutely and unqualifiedly." 344 F.3d at 1357 (quoting *Estate of Bogley v. United States,* 206 Ct.Cl. 695, 514 F.2d 1027, 1032 (1975)).

Rather than being similar to the regulatory transactions in *D & N Bank* and *Anderson,* the trial court rightly analogized the present case to *California Federal (Cal Fed).* In *Cal Fed,* this court examined all the contemporaneous documents and determined that "the government bargained with Cal Fed to assume the net liabilities of the acquired thrifts in exchange for favorable regulatory consideration allowing goodwill to be counted as an asset for regulatory capital purposes and to be amortized over 35 to 40 years." 245 F.3d at 1347. Even though the Government asserts that the Acquirors did not negotiate with the Government regarding the treatment of goodwill, this court agrees with the trial court that "the facts and circumstances surrounding the August 24, 1984 Resolution approving the conversion establish[ ] a bargained-for agreement in which the acquirors agreed to infuse capital into the institution, and thus save the bank from immediate liquidation, based on the express understanding that they would in exchange receive the above-specified goodwill." *LaVan,* 53 Fed. Cl. at 298. This court therefore affirms the trial court's finding of a contract.

### B.

■ Anticipating the possibility that this court would uphold the contract found by the trial court, the Government argues that the Acquirors, as post-conversion shareholders of Century, have no standing to sue for breach of contract. *See Erickson Air Crane Co. v. United States,* 731 F.2d 810, 813 (Fed.Cir.1984) (stating that "[t]he government consents to be sued only by those with whom it has privity of contract"). In support of its argument, the Government cites *Federal Deposit Insurance Corp. v. United States,* 342 F.3d 1313 (Fed.Cir.2003) (*Karnes* ), and *Cain v. United States,* 350 F.3d 1309 (Fed.Cir. 2003). In *Karnes,* this court examined various communications between the thrift, Karnes, and the FHLBB and determined that none showed that the shareholders, the Lees, negotiated with the Government. In fact, this court determined that only the president of the thrift participated in the negotiations. Going beyond the absence of direct negotiations between the Lees and the Government, this court explained:

> To be sure, the regulators undoubtedly were aware that the Lees were supplying the money that would be used to rehabilitate Karnes. Neither that knowledge, the supplying of the new capital, or the Lees' position as stockholders in Karnes, made them parties to those arrangements. A shareholder

generally does not have standing to assert a breach of contract claim on behalf of the corporation.

*Karnes,* 342 F.3d at 1319. This case, however, presents a transaction factually distinct from the *Karnes* case. In *Karnes,* the Lees acquired Karnes by first creating a new thrift, then merging that thrift into Karnes. Here, on the other hand, the Acquirors were an integral part of the conversion of CSLA to Century: at every step during the process, the Government clearly understood and acknowledged the identities of the Acquirors. During the initial application phase when the Government requested additional capital for Century, the documents specified the Acquirors and their respective ownership of shares. During the internal deliberation phase when the Government was determining whether the transaction would be eligible for push-down accounting, the Acquirors' role as both officers of the mutual association and investors in the stock association raised the specter of a non-arm's-length transaction. This concern was alleviated in part because the Government understood that it and the Acquirors were each negotiating in their own best interest. Perhaps most importantly, both Bank Board Resolutions named the Acquirors and expressly approved the transaction conditioned on their ownership of Century. Thus, the Government did not merely know that the Acquirors would be supplying the money to convert CSLA into Century; rather, the Government recognized and required their participation. Simply put, the documents demonstrate that the Acquirors were essential to the transaction.

In *Cain,* a mutual association, Security Federal, applied for conversion to a stock association. Under the conversion plan, the directors of the mutual association provided the extra capital necessary to form the new association by purchasing the new institution's stock. *Cain,* 350 F.3d at 1311. The FHLBB approved the conversion in a letter addressed to the four directors who had acquired the largest number of shares and to Security Federal's board of directors. The FHLBB also did not disapprove the change in control provided that the new stockholders complied with certain conditions, such as an upper bound on the amount of dividends that the new thrift would pay. The letter in *Cain* stated, in part:

> We have also completed our review of the Notices of Change in Control of the Association filed by Messrs. Hardee, Harrison, Haney and Dantzler (collectively, the "Acquirors") for authority to acquire control of the Association pursuant to 12 U.S.C. § 1730(q) and 12 C.F.R. Part 574 upon consummation of its conversion to stock form.

*Id.* at 1314–15. This court, however, noted that that "letter does not contain or provide any contractual commitment by the Bank Board to the [seven] Shareholders." *Id.* at 1315. In particular, this court found the letter was sent to only four of the seven shareholders—a dead giveaway that the Government was merely performing its regulatory functions:

> The Bank Board's addressing of the notice of approval to the thrift's four largest shareholders can not be viewed as manifesting intent to enter into a contract with them. The obvious reason for the Board doing so was because the Board's approval letter also authorized them to acquire control of the new association. Since those four had filed the applications to acquire control, the Bank Board naturally sent them its letter approving such acquisition. Indeed, if the Bank Board intended to enter into a contract with the Shareholders, why would it have sent the letter only to four of the seven of them?

*Id.* After dismissing the import of the approval letter, this court further examined affidavits of the shareholders explaining the criticality of the thrift's treatment to their investment and other documentary evidence purporting to evince a direct contract with the Government. While acknowledging that "whether the government entered into a contract with a thrift's shareholders necessarily turns on the facts of the particular case," *id.* at 1317, this court held that the thrift's shareholders were not direct parties to the contract. As explained above in distinguishing *Karnes,* however, the facts of this particular case compel a different conclusion.

In this case, the Government directly contracted with the Acquirors. The Government approved the transaction only on condition that the Acquirors would provide the capital necessary to convert CSLA into Century. At every step along the process, the Government knew of the sources of the capital (even to the point of soliciting additional capital from them). Indeed, the Acquirors' identities caused internal deliberations about push-down accounting and the arm's-length nature of the conversion. Furthermore, the first Board Resolution states that "the proposed acquisition of control of Century resulting from the acquisition of its conversion stock by the Acquirors is hereby not disapproved...." And the second Board Resolution reiterates that "the acquisition of all of Century's conversion stock by John W. Lence, Stanley Skozek, Carmen Lullo, and Richard C. LaVan is hereby approved." Thus, this court concurs with the trial court, which summarized: "[T]he undisputed facts plainly establish that Messrs. LaVan, Lullo, and Skozek were, as individuals, 'the acquirors' who negotiated with the FHLBB to purchase the converted federally-insured institution. These individuals were the direct purchasers who then became 'shareholders' in the new institution."

*LaVan,* 53 Fed. Cl. at 300–01. Thus, the facts, although seemingly analogous to *Cain,* are markedly different, because the evidence shows that these specific Acquirors were critical to the conversion in this case, whereas the particular shareholders were unimportant to the conversion in *Cain.* Because this court affirms the Government's direct contract with the Acquirors, it does not reach the issue of whether the Acquirors were third-party beneficiaries under the contract. *Cf. Glass v. United States,* 258 F.3d 1349, 1354–55 (Fed.Cir. 2001) (holding that the shareholders were not third-party beneficiaries because they were not directly benefited by the contract between the Government and the thrifts); *First Hartford Corp. Pension Plan & Trust v. United States,* 194 F.3d 1279, 1289 (Fed.Cir.1999) (explaining the exceptions to the general rule that "the government consents to be sued only by those with whom it has privity of contract" (quoting *Erickson Air Crane,* 731 F.2d at 813)).

## C.

■ Because the Acquirors contracted with the Government and FIRREA breached that contract, the trial court awarded restitution totaling the amount of the Acquirors' initial investment. *LaVan,* 56 Fed. Cl. at 583. While the Government did not appeal that award, the Acquirors argue that they are entitled to expectancy damages instead. These expectancy damages, according to the Acquirors, equate to the increased market value of their shares evidenced by the aborted sale of their stock in Century to a third-party holding company, Century Savings Bankcorp. Because Century Savings Bankcorp would have paid $14.31 per share, the Acquirors seek an additional $4.31 per share tacked onto the restitutionary award of $10 per share. The Acquirors particularly assert that the trial court mistakenly incorporat-

ed the Government's argument on standing into the damages opinion.

■ This court agrees that the trial court erroneously conflated the issues of damages and standing in holding that the increased value of the Acquirors' stock belongs to the thrift, not the Acquirors. Undoubtedly, "[a] suit for damages arising from an injury to the corporation can only be brought by the corporation itself or by a shareholder derivatively if the corporation fails to act, since only the corporation has an action for wrongs committed against it." *Gaff v. Fed. Deposit Ins. Corp.*, 814 F.2d 311, 315 (6th Cir.1987) (citation omitted). That rule, however, does not limit damages, but instead arises from "the general precept of corporate law that a shareholder of a corporation does not have a personal or individual right of action for damages based solely on an injury to the corporation." *Id.* The Government may well have breached a contract with Century by the enactment of FIRREA, thus giving Century as well a claim against the Government.[2] Nonetheless, in this case, the Government breached a direct contract with the Acquirors personally and apart from the Acquirors' status as shareholders. Therefore, the direct harm caused to the Acquirors by this breach is separate and distinct from any harm flowing through Century to the Acquirors as shareholders. This court sees no reason to limit the Acquirors' damages based on a separate and distinct injury to Century. *See Strougo v. Bassini*, 282 F.3d 162, 171 (2d Cir.2002) (explaining that "when the shareholders of a corporation suffer an injury that is distinct from that of the corporation, the shareholders may bring direct suit for redress of that injury"). Accordingly, this court holds that the trial court erred in determining that

the Acquirors' "alternative claim for expectancy and reliance damages based on the loss of the alleged incremental value of their stock must be dismissed for lack of standing." *LaVan*, 56 Fed. Cl. at 586.

In addition to ruling that the trial court erred in denying them the opportunity to present a case for expectancy damages, the Acquirors would have this court go further and award those damages outright. This court, however, sits as a court of review and is ill-suited for making factual determinations in issues not faced initially by a trial court. *Smithkline Beecham Corp. v. Excel Pharms., Inc.*, 356 F.3d 1357, 1364–65 (Fed.Cir.2004) (explaining that when parties develop a record in light of a different legal standard, this court should remand for a factual development rather than find facts in the first instance). This court therefore declines the Acquirors' invitation and remands for the trial court to determine whether expectancy damages would be appropriate in the present case.

Even though expectancy damages are not before this court, "the interest of judicial economy makes it appropriate for us to state our views on this issue for the benefit of the parties and the trial court." *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1314 (Fed.Cir.2004). This court has acknowledged, among the remedies for breach of contract, that "[c]ompensation of a party's expectation interest 'attempts to put him in as good a position as he would have been in had the contract been performed, that is, had there been no breach.'" *Id.* at 1308 (quoting Restatement (Second) Contracts § 344 cmt. a. (1981)). "One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not

---

**2.** Whether Century can in fact recover for the Government's breach is not presently at issue; therefore, this court does not opine on Century's entitlement to damages.

occurred." *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1380 (Fed. Cir.2001).

▮ In this case, the Acquirors seek lost profits from the unconsummated sale, which are "a recognized measure of damages, where their loss is the proximate result of the breach and the fact that there would have been a profit is definitely established, and there is some basis on which a reasonable estimate of the amount of the profit can be made." *Neely v. United States,* 152 Ct.Cl. 137, 285 F.2d 438, 443 (1961); *see also Myerle v. United States,* 33 Ct.Cl. 1, 27 (1897) ("For a damage to be direct there must appear no intervening incident (not caused by the defaulting party) to complicate or confuse the certainty of the result between the cause and the damage; the cause must produce the effect inevitably and naturally, not possibly nor even probably."). To be recoverable, lost profits must be "such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then would form a just and proper item of damages, to be recovered against the delinquent party upon breach of the agreement." *Wells Fargo Bank, N.A. v. United States,* 88 F.3d 1012, 1023 (Fed.Cir.1996) (quoting *Ramsey v. United States,* 121 Ct.Cl. 426, 101 F.Supp. 353, 358 (1951)). Lost profits are "part and parcel of the contract itself, and must have been in the contemplation of the parties when the agreement was entered into." *Ramsey,* 101 F.Supp. at 358 (quoting *Myerle,* 33 Ct.Cl. at 26). Lost profits, however, are not recoverable where "they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract." *Wells Fargo,* 88 F.3d at 1023 (quoting *Ramsey,* 101 F.Supp. at 358). In such a case, "they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit." *Id.*

▮ Therefore, the Acquirors may recover lost profits only if they

establish by a preponderance of the evidence that: (1) the loss was the proximate result of the breach; (2) the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty.

*Energy Capital Corp. v. United States,* 302 F.3d 1314, 1325 (Fed.Cir.2002) (citation omitted); *see also Bluebonnet Sav. Bank, F.S.B. v. United States,* 266 F.3d 1348, 1355 (Fed.Cir.2001) ("Expectation damages are recoverable provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty."). If the trial court determines that the Acquirors cannot adequately prove their lost profits, restitution is still available "as a fall-back position." *Glendale,* 239 F.3d at 1380.

### D.

▮ The Acquirors argue that, if this court were to determine that the Government did not contract with them, they are entitled to just compensation under a takings theory. In other words, FIRREA took their investment in Century. This court rejected a similar argument in *Castle:* "The breach-of-contract based takings claim fails because even assuming it was breached, the alleged contract did not create a reasonable expectation that the government would cease regulating the thrift industry, or any particular thrift therein." *Castle,* 301 F.3d at 1342. Indeed, this

court ruled against the takings claim because "the plaintiffs retained the full range of remedies associated with any contractual property right they possessed." *Id.* This court has consistently reaffirmed this binding precedent. *See Karnes,* 342 F.3d at 1320 ("This panel, however, is bound by *Castle* and cannot overrule it."); *Bailey v. United States,* 341 F.3d 1342, 1347 (Fed. Cir.2003) (explaining that there was no "regulatory taking because Bailey ... was not deprived of a contractual remedy for the government's breach to recover the thrift's assets"). Accordingly, this court affirms the trial court's denial of the Acquirors' takings claim to the extent it seeks damages beyond contract damages.

### III.

This court affirms the trial court's decisions that the Government formed a contract, that the Acquirors were direct parties to that contract, and that the Acquirors cannot recover under a takings theory. This court, however, vacates the trial court's decision with respect to expectancy damages and remands for further factual development of the record in light of the proper legal framework.

### COSTS

Each party shall bear its own costs.

*AFFIRMED–IN–PART, VACATED–IN–PART, and REMANDED.*

LINN, Circuit Judge, concurring-in-part and dissenting-in-part.

I join the court's opinion with respect to Parts I, II.A, and II.B. However, I cannot agree that the plaintiffs in this case are entitled to pursue their claim for expectation damages as the majority holds in Part II.C. With respect to this issue, I think the Court of Federal Claims correctly concluded that the Acquirors were precluded from pursuing their claim because their injury was not distinct from that of the corporation, Century Federal Savings Bank ("Century"). *See La Van v. United States,* 56 Fed. Cl. 580, 585–86 (2003).

The majority holds that the Acquirors are entitled to proceed with their claim for expectation damages because the Court of Federal Claims erroneously conflated the issues of damages and standing. *Ante* at 1350. The majority notes that the entity, Century, may have a claim as well against the government but concludes that the Acquirors' injury in this case is separate and distinct from that of Century. *Ante* at 1350 n. 2. With all due respect, I believe that the majority does not provide support for its holding that the injury is separate and distinct. Moreover, it is my view that such holding is contrary to the two cases it cites, *Gaff v. Federal Deposit Insurance Corp.,* 814 F.2d 311 (6th Cir.1987), and *Strougo v. Bassini,* 282 F.3d 162 (2d Cir. 2002).

In *Gaff,* the Sixth Circuit recognized that a federal statute expressly authorized a direct action by shareholders against a former bank officer where the claim was one for breach of a fiduciary duty owed to both the bank and the shareholders. 814 F.2d at 315–17. Despite the express statutory provision conferring standing on the shareholders in that case, the court acknowledged the common law rule that "[a] depreciation or diminution in the value of a shareholder's corporate stock is generally not recognized, however, as the type of direct, personal injury which is necessary to sustain a direct cause of action." *Id.* at 315. Based on this common law rule, the court said, "We simply conclude that damages resulting from directors' misconduct which merely consist of the diminishment or destruction of the value of corporate stock do not qualify as a direct or personal injury to a shareholder and therefore will

not support a direct cause of action under § 93." *Id.* at 317–18. The Acquirors' claim for expectation damages in this case is simply based on diminution in share value. Such an injury is not distinct from that of the corporation.

The standard set forth in *Strougo* would similarly preclude the Acquirors' claim for expectation damages in this case because *Strougo* adopts the standard set forth in *Gaff*, albeit under Maryland law. The majority cites *Strougo* for the proposition that shareholders of a corporation may bring a direct suit based upon injuries that are distinct from those suffered by the corporation. However, the majority fails to examine the specific holdings in that case. *Strougo* recognized that shareholders are owed a separate fiduciary duty by corporate officers under Maryland law. *Id.* at 172–74. However, the court rejected a breach of fiduciary duty claim for loss in share value based on underwriting fees because such fees "incurred by a corporation decrease share price primarily because they deplete the corporation's assets, precisely the type of injury to the corporation that can be redressed under Maryland law only through a suit brought on behalf of the corporation." *Id.* at 174. The court did allow claims directed to dilution of share value to proceed because "it would appear that the alleged injuries were to the shareholders alone and not to the Fund." *Id.* at 175. Although in this case the government was contractually obligated to the Acquirors separately from Century, the situation is indistinguishable from that in *Strougo* because the corporate officials in *Strougo* owed independent fiduciary duties to both the shareholders and the corporation. *Id.* at 172–74. *Strougo* does not support allowing the plaintiffs in this case to proceed because they are merely claiming damages based on diminution in share value, which is not distinct from the injury to the corporation.

A contrary position was reached by the Ninth Circuit in *Harmsen v. Smith,* 542 F.2d 496 (9th Cir.1976). In that case, the Ninth Circuit concluded without explication and over a vigorous dissent that diminution in share value was sufficient to confer standing. The Ninth Circuit's conclusion in *Harmsen* was rejected by the Sixth Circuit in *Gaff* as inconsistent with the common law. Subsequently, in the context of the *Winstar* cases, the Ninth Circuit again took the position on standing that it took in *Harmsen.* In *Far West Federal Bank, S.B. v. Office of Thrift Supervision–Director,* 119 F.3d 1358, 1364 (9th Cir.1997), the Ninth Circuit quoted *Buschmann v. Professional Men's Association,* 405 F.2d 659, 662 (7th Cir.1969), for the proposition that " 'an individual cause of action can be asserted when the wrong is both to the stockholder as an individual and to the corporation.' " Without further analysis, the Ninth Circuit adopted that rule. However, an examination of *Buschmann* reveals that it does not support the Ninth Circuit's position in *Far West.* The Seventh Circuit in *Buschmann* explained that the damages sought in that case "were not sustained by New Corporation and thus could not have been asserted by New Corporation in an action against the defendant." 405 F.2d at 663.

Because I consider the weight of authority to be against the Acquirors' claim for expectation damages in this case, I would affirm the Court of Federal Claims' decision that the Acquirors lacked standing to pursue such a claim.