NEWMAN, Circuit Judge,
concurring in part and dissenting in part.
I concur in the court’s holding that the complaint of Mola Development Company was filed within the six-year limitations period of the Tucker Act. However, the court errs in ruling that there was no contract between Mola and the federal bank authorities. The arrangement whereby Mola agreed to contribute a total of $3.5 million in cash upon merger with the insolvent Merit Savings Association, and the government agreed to classify this merger as a supervisory case, was fully agreed, recorded, and implemented, in accordance with ordinary contract principles. The extensive written exchanges, along with the agency documentation, produced an integrated contract that is not distinguishable in its premises from the contract in United States v. Winstar Corp., 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The circumstances and documents left no doubt that a contract including supervisory goodwill was intended and formed, to implement government’s program created with the sole purpose of encouraging healthy thrifts to acquire insolvent ones in order to reduce the government’s liability to the failing banking industry. The Court of Federal Claims erred in its holding that there was no contract and no liability. I respectfully dissent from my colleagues’ affirmance of this decision, on this court’s finding that no single document contains all of the contract conditions and the mistaken understanding of the government’s approval of the merger as a supervisory case for accounting purposes.
DISCUSSION
As discussed in Winstar, between 1981 and 1983 approximately 435 thrift institutions had failed and the Federal Savings and Loan Insurance Corporation (FSLIC) was exhausting its insurance fund. In this critical situation, the Federal Home Loan Bank Board (FHLBB) encouraged solvent banks and thrift institutions to salvage insolvent thrifts. As the Court explained in Winstar, the government’s liability was substantially reduced when insolvent thrifts were enabled to remain in operation, as compared with the cost of federal liquidation. 518 U.S. at 847-48, 116 S.Ct. 2432. Thus the government provided substantial incentives, including accounting procedures that achieved paper compliance with capital requirements; these procedures were manifested in the “purchase method” of accounting for liabilities that were designated as “supervisory goodwill,” accompanied by long-term amortization and various other concessions and forbear-ances. The Court remarked particularly on the accounting treatment of supervisory mergers, for
[T]he principal inducement for these supervisory mergers was an understand *1382 ing that the acquisitions would be subject to a particular accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations.
518 U.S. at 848, 116 S.Ct. 2432. The Court explained that the purchase method of accounting implemented recognition of supervisory goodwill and enabled the merged entity to meet capital requirements:
Under GAAP there are circumstances in which a business combination may be dealt with by the “purchase method” of accounting.... The critical aspect of that method for our purposes is that it permits the acquiring entity to designate the excess of the purchase price over the fair value of all identifiable assets acquired as an intangible asset called “goodwill.” ... Goodwill recognized under the purchase method as the result of a FSLIC-sponsored supervisory merger was generally referred to as “supervisory goodwill.”
Id. at 849, 116 S.Ct. 2432.
FIRREA ended this system, and prohibited the use of supervisory goodwill and long-term amortization to meet capital requirements. Many of the acquired thrifts fell out of compliance, and were seized and liquidated by the government; in Winstar the Court ruled that the enactment and implementation of FIRREA breached the government’s contractual obligations incurred in authorizing such acquisitions.
Such a breach occurred here. The contract between Mola and the federal government was an integrated combination of various documents involving the government, Mola and its subsidiary Charter, and the insolvent Merit Savings Association. Mola agreed to contribute approximately $2.5 million in cash to the merged Charter/Merit thrift institution, plus an additional $1 million to Merit’s shareholders, and the government agreed to classify the merger as “supervisory.” Although the panel majority states that “the FHLBB’s approval letter did not mention regulatory treatment of goodwill,” maj. op. at 1374, the majority’s conclusion is inaccurate, for the classification as “supervisory” achieves the regulatory treatment of goodwill. As the record shows, this treatment was essential to Mola’s agreement to acquire the insolvent Merit thrift institution, and essential to the merged institution’s compliance with capital requirements.
The contractual arrangement between Mola and the government involved various documents, including Mola’s H-(e)3 application, filed on April 19, 1988. The H-(e)3 application included a “Consolidated Charter & Merit Balance Sheet” that listed supervisory goodwill as an asset valued at $10,996,000 as of December 30, 1987. In paragraph (g) of the H-(e)3 application, entitled “Accounting Procedures,” Mola stated the condition “to record the acquisition of Merit as a purchase transaction under generally accepted accounting principles ... and Statement of Financial Accounting Standards No. 72 (‘FASB No. 72’).” The record shows FASB No. 72 as the Financial Accounting Standards Board standard 72 for “the amortization period of goodwill.” Paragraph (g) also states that “identifiable intangible assets acquired” include “FASB No. 72 goodwill.” The H(e)3 application compiled the information that the record showed to be under discussion as the offer from Mola to merge the insolvent Merit into Mola’s solvent subsidiary Charter, through a supervisory acquisition. Mola’s H-(e)3 application included the purchase method of accounting based on supervisory goodwill and long-term amortization.
*1383 The progress of the negotiations was recorded in various government documents, as in Winstar. A FHLB San Francisco (FHLBSF) memorandum dated May 18, 1988, by Supervisory Agent Mr. Paula, records the “goodwill to be carried on the books” of the merged Charter/Merit institution:
It is important to note that when the total amount of goodwill to be carried on the books of the resulting institution, $10,996,000, is subtracted [from $22,758,-000], the capital of the resulting institution falls to $11,762,000 or 2.6 percent of liabilities.
FHLBSF Memo, at 3. A letter dated June 7, 1988 to the FHLBSF Office of General Counsel specifically addressed the question: “Should the Federal Home Loan Bank Board issue a certificate deeming Merit Savings Bank a supervisory case for the purposes of the subject application?” The FHLBSF letter stated that “the applicant has requested that Merit be deemed a supervisory case by the Bank Board and that the subject acquisition be considered as being instituted for supervisory purposes.” The FHLBSF letter recommended that “the Secretariat of the Bank Board deem Merit a supervisory case.” Letter at 3. The FHLBSF letter also stated that Mola’s request for forbearance from the minimum capital requirement would not be approved except for Merit’s “Scheduled Items.” Id. There followed the FHLB’s letter to Mola dated June 24, 1998, stating that Mola’s H-(e)3 application was approved subject to these “Scheduled Items.”
Approximately a month after the government’s approval of the H-(e)3 application, a FHLBSF memorandum dated July 26, 1988, entitled “Charter Savings Bank ... Negotiations for Application H-(e)3 for the Acquisition of Merit Savings Bank,” summarized the circumstances leading to the approval of the merger. This memorandum reported discussions of the merger terms in at least six meetings over the period from May 5, 1988 to May 24, 1988. The memorandum stated that on May 19, 1988 the FHLBB presented six conditions that it required, and that Mola responded on May 20, 1988 during a conference call by modifying the second condition, adding a seventh condition, and accepting the other conditions. The seventh condition was: “The acquisition is being instituted for supervisory purposes.” Mola’s proposed modification of the second condition was rejected by the FHLBSF on May 23, 1988, and on May 24, 1988 Mola acquiesced in the rejection and accepted condition two in its original form, but insisted on condition seven.
The Bank Board agreed to condition seven, and the FHLBSF memorandum of July 26, 1988 states that on May 24, 1998 the parties reached agreement and that “[t]he Bank Board will provide the necessary certification indicating that this acquisition falls within the requirements of a supervisory case.” Mola testified during trial that “[o]n June 24, 1998, [Mola] got the approval letter from the Federal Home Loan Board, and on that same date, the Federal Home Loan Bank Board issued a certificate deeming Merit a supervisory case.” The testimony was undisputed.
The merger of Charter and Merit closed on July 29, 1988, with the supervisory goodwill of the merged institution valued at $15,741,000 on the date of the merger. Both Mola and the government included goodwill in the accounting of Charter’s regulatory capital, until December 7, 1989, the effective date of FIRREA. Thereafter the merged institution was prohibited from *1384 utilizing the purchase method of accounting, and without the goodwill asset the institution was immediately out of capital compliance. Charter was seized and liquidated.
The government’s liability for breach of contract on these premises was established by Winstar. Despite this clear precedent, my colleagues now rule that there was no contract, no obligation, and no liability, because no single document contained all of the terms of the transaction. Indeed, that was the Winstar situation, where the Court ruled that the total documentation comprised an integrated contract. The Court described such arrangements as follows:
[T]he [FHLBB] resolutions, Forbearance Letters, and other documents setting forth the accounting treatment to be accorded supervisory goodwill generated by the transactions were not mere statements of then-current regulatory policy, but in each instance were terms in an allocation of risk of regulatory change that was essential to the contract between the parties.
Winstar, 518 U.S. at 909, 116 S.Ct. 2432. In Fifth Third Bank of Western Ohio v. United States, 402 F.3d 1221, 1235 (Fed.Cir.2005), this court held that even in the absence of a single formal document stating the entire agreement between the institution and the government, the documentary evidence constituted an agreement concerning supervisory goodwill, the court “[a]nalyzing not only the contemporaneous documents but also the circumstances surrounding the transactions[J” 402 F.3d at 1229. As in Fifth Third Bank, “the evidence demonstrates that in light of the discussions between the Government and the acquiring thrift with regards to protections affecting capital requirements, including supervisory goodwill, the parties agreed that the acquiring thrift was to be given the favorable accounting treatment of supervisory goodwill and amortization.” Id. at 1232.
The panel majority appears to mistake the undisputed evidence, for my colleagues state that “Mola here points to no evidence of any negotiations about the regulatory treatment of goodwill that could serve as evidence that the government agreed to a goodwill contract.” Maj. op. at 1378. This is contrary to the record, and contrary to Winstar precedent. The facts herein differ from those in. D & N Bank v. United States, 331 F.3d 1374 (Fed.Cir.2003), on which the majority relies, for “D & N ... simply submitted an application for approval of the merger, and the Bank Board accepted it,” and this court found that “there was no negotiation between D & N Bank and the Bank Board that resulted in approval of the merger.” Id. at 1379. In contrast, Mola’s acquisition of Merit incurred multiple rounds of negotiation, with supervisory goodwill as an essential component that was negotiated and agreed. As the Court discussed in Winstar, it was well understood that absent accounting for supervisory goodwill there would be little reason for a healthy bank to assume the liabilities of an insolvent bank, when such assumption would render it immediately insolvent and in danger of receivership. The Court explained the purposes of supervisory goodwill:
Supervisory goodwill was attractive to healthy thrifts for at least two reasons. First, thrift regulators let the acquiring institutions count supervisory goodwill toward their reserve requirement under 12 CFR § 563.13 (1981). This treatment was, of course, critical to make the transaction possible in the first place, *1385 because in most cases the institution resulting from the transaction would immediately have been insolvent under federal standards if goodwill had not counted toward regulatory net worth.
518 U.S. at 850, 116 S.Ct. 2432.
The panel majority errs in ruling that the approval of a supervisory merger “does not establish any contract to maintain this treatment of goodwill,” maj. op. at 1380, for that is what a supervisory merger is about.[1] My colleagues appear to mistake the purchase method of accounting. See, e.g., First Commerce Corp. v. United States, 335 F.3d 1373, 1377 n. 1 (Fed.Cir.2003) (“When the purchase method is used to account for a merger, any excess of the purchase price over the fair value of the thrift’s net assets is recorded as goodwill.”). Mola’s negotiations leading to designation as a “supervisory case” were targeted to this purpose. See Franklin Fed. Sav. Bank v. United States, 431 F.3d 1360, 1362 (Fed.Cir.2006) (“The thrifts desired to use the ‘purchase’ method of accounting, under which the newly created thrift could designate the excess of the purchase price over the fair value of all acquired assets as an intangible asset called ‘supervisory goodwill,’ and claim it as an asset for purposes of computing regulatory capital.”); Fifth Third Bank, 402 F.3d at 1224 (same). The panel majority’s further holding that 12 CFR § 563.13, cited supra in Winstar, does not concern the purchase method of accounting is also off the mark, for the accounting use of supervisory goodwill to meet the reserve requirements under 12 CFR § 563.13 was “critical to make the transaction possible in the first place.” 518 U.S. at 850, 116 S.Ct. 2432.
A contract was formed as it was in Winstar. Mola’s H-(e)3 application, the negotiations, the issuance of the certificate of “supervisory case,” and the various confirming documents, verified the contractual arrangement. See, e.g., Fifth Third Bank, 402 F.3d at 1235 (“The totality of the evidence and the circumstances demonstrate that the parties intend to and did create contractual obligations which included the utilization of supervisory goodwill as an accounting treatment for capital compliance.”); La Van v. United States, 382 F.3d 1340, 1346-47 (Fed.Cir.2004) (holding that an implied-in-fact contract was established between the government and the acquiring thrift “[a]s evidenced by an internal memorandum, the treatment of goodwill was at the epicenter of the conversion process”); LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363, 1370 (Fed.Cir.2003) (“These arrangements concerning goodwill [including a Financing Agreement and a Bank Board Resolution] and the infusion of capital from various sources enabled Taiman in 1986 to meet the existing capital requirements.”); California Fed. Bank v. United States, 245 F.3d 1342, 1347 (Fed.Cir.2001) (holding that even without an assistance agreement or a supervisory action agreement, the factual records of the case including various correspondence, memoranda and bank board resolutions show intent to contract *1386 with the government for specified treatment of goodwill). The panel majority’s criticism that “no document” contains the entire contract does not defeat the formation of a contract. A similar procedure was discussed in Caroline Hunt Trust Estate v. United States, 470 F.3d 1044, 1050 (Fed.Cir.2006), where this court affirmed that the acquiring institution made an offer to the government in its H-(e)3 application, and that a contract ensued when the terms were negotiated and accepted. “Whether a bargained-for exchange occurred depends on the surrounding factual circumstances.” Hometown Financial, Inc. v. United States, 409 F.3d 1360, 1365 (Fed.Cir.2005) (affirming the district court’s holding that “the correspondence, memoranda, forbearance letters, and regulatory maintenance and dividend agreement gave rise to a contract which included provisions addressing goodwill”).
The record establishes that there was a bargained-for exchange, and that the ensuing contract was breached by the subsequent enactment of FIRREA and the seizure and liquidation of Charter. I must, respectfully, dissent from the court’s holding that there was no contract and no breach.

. Expert testimony explaining the role of supervisory goodwill was presented in the Court of Federal Claims by Mr. Minijit Johal, former official of the Federal Home Loan Bank of San Francisco, explaining 12 CFR § 563.13(7)(I) & (III) as requiring the "supervisory” designation for the purpose of using the purchase method of accounting, to convert goodwill based on losses into an accounting asset. My colleagues decline to accept this expertise, although the identical principle was explained in Winstar. See maj.op.at 1378 n. 5.